**Wilfredo ACOSTA, Appellant and Cross-Appellee,**

v.

**HONDA MOTOR COMPANY, LTD., Appellee and Cross-Appellant.**

**Wilfredo ACOSTA, Appellant and Cross-Appellee,**

v.

**AMERICAN HONDA MOTOR COMPANY, INC. and Daido Kogyo Company, Ltd., Appellees and Cross-Appellants.**

Nos. 82–3254, 82–3255, 82–3256 and 82–3257.

United States Court of Appeals, Third Circuit.

Argued April 27, 1983.

Decided Sept. 21, 1983.

Rehearing and Rehearing En Banc Denied Dec. 7, 1983.

John E. Stout (argued), Grunert, Stout & Smock, St. Thomas, V.I., for appellant and cross-appellee.

Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski, Livingston, N.J., for appellees and cross-appellants; John I. Lisowski (argued), Livingston, N.J., of counsel and on brief; Loud, Watts & Murnan, Frederick G. Watts, Nan L. Blumenfeld, Charlotte Amalie, St. Thomas, U.S. V.I., of counsel.

Before GIBBONS, SLOVITER and BECKER, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

In the absence of contrary authority and coupled with the common law, the restatements of law approved by the American Law Institute provide the rules of decision in the Virgin Islands. V.I.Code Ann. tit. 1, § 4 (1967). This case presents the important question whether Virgin Islands law permits the award of punitive damages against defendants who have been found strictly liable under section 402A of the *Restatement (Second) of Torts* for having marketed defective products. We hold that punitive damages may be awarded against such defendants, but only when the plaintiff proves the requisite outrageous conduct by clear and convincing evidence. Because we find that plaintiff did not adduce such proof as to the conduct of any of the defendants, we will affirm the district court's order granting the motion of American Honda Motor Co., Inc. ("American Honda") for judgment n.o.v. on that issue, and we will reverse the denial of similar motions on behalf of defendants Honda Motor Co., Ltd. ("Honda") and Daido Kogyo, Co., Ltd. We find no merit, however, in defendants' challenges to the award of compensatory damages, and we will affirm that aspect of the judgment. Finally, in light of our disposition of the punitive damages claim, we will remand for reconsideration the district court's order awarding attorneys fees pursuant to Virgin Islands law.

I.

In early 1976, plaintiff purchased a used Honda CB750 motorcycle. At that time the motorcycle was six years old; plaintiff was its third owner. Approximately two months after he bought the motorcycle, plaintiff was injured when he was thrown from the motorcycle while riding at night on a lighted road in St. Thomas. According to his testimony, he was driving at approximately 30–35 miles per hour when he saw in the road a repair ditch approximately four inches deep and ten feet long. He testified that he slowed down, retained control of the motorcycle, and maneuvered it straight through the ditch. As he was exiting the ditch, however, the motorcycle's rear wheel hit the back edge of the ditch and collapsed. Despite plaintiff's efforts to maintain control, the collapsed rear of the motorcycle jerked into the air, tossing him to the ground. Plaintiff sustained multiple

injuries, including four fractured vertebrae, a broken femur, and a punctured liver.

Plaintiff subsequently brought this action in the District Court for the District of the Virgin Islands against defendants Honda, the manufacturer of the motorcycle; Daido Kogyo, the company responsible for manufacturing and assembling the rear wheel; and American Honda (a wholly-owned subsidiary of Honda), the motorcycle's distributor. The complaint, which stated causes of action in negligence, strict product liability under section 402A of the *Restatement (Second) of Torts,* and breach of implied warranty of merchantability, *see* V.I.Code Ann. tit. 11A, § 2–314 (1965), alleged defective design and manufacture of the rear wheel, as well as a failure to warn that the wheel was too weak to withstand contact with the rim of the ditch.

At the conclusion of the trial, the court instructed the jury on negligence and strict liability,[1] as well as on the availability of punitive damages. Pursuant to an agreement between counsel, the jury was given lengthy special interrogatories which, among other things, directed it to consider the strict liability count first and, if it found the defendants liable thereon, to disregard the negligence count.

The jury found the defendants liable on the strict liability count and awarded the plaintiff $175,000 in compensatory damages. The jury also assessed punitive damages of $210,000 against each defendant. Defendants subsequently moved for judgment notwithstanding the verdict on the ground that there was insufficient evidence to support either compensatory or punitive damages. Noting that it was "taken aback, slightly, that the award was in such a modest amount," the court affirmed the award of compensatory damages. The court also stated, without elaboration, that the evidence disclosed sufficiently "outrageous or reckless conduct" on the part of Honda and Daido to warrant sustaining the punitive damages against them. The court confessed error, however, in having allowed the

jury to consider punitive damages against American Honda and granted the judgment n.o.v. motion as to that aspect of the verdict. The court also awarded Acosta costs and attorneys fees pursuant to 5 V.I.C. § 541 (1967). Plaintiff then appealed from the grant of judgment n.o.v. for American Honda; defendants Honda and Daido Kogyo cross-appealed from the court's denial of their motions for judgment n.o.v. and attorney's fees.

## II.

The first issue that we must address is plaintiff's contention that, under Fed.R. Civ.P. 50, defendants' failure to make a sufficiently specific motion for a directed verdict at the close of all the evidence foreclosed the district court from considering, much less granting, a motion for judgment n.o.v. Plaintiff points to two rules. Rule 50(a) requires that a "motion for a directed verdict shall state the grounds therefor." Rule 50(b) allows only a party who has moved for a directed verdict to move after an adverse jury verdict to have "the judgment entered in accordance with his motion for a directed verdict." Although a liberal (and perhaps literal) reading of Rule 50(b) could imply that *any* motion for a directed verdict, no matter how vague, could satisfy the Rule 50(b) prerequisite provision, an understanding of the purpose behind the specificity requirements of Rule 50 shows the impropriety of such a construction. *See Huddell v. Levin,* 395 F.Supp. 64, 80–81 (D.N.J.1975); *vacated on other grounds,* 537 F.2d 726, 741 (3d Cir.1976).

Rule 50(b) is essentially a notice provision that, among other functions, protects the important seventh amendment right of trial by jury. A motion for a judgment n.o.v. must be preceded by a motion for a directed verdict sufficiently specific to afford the party against whom the motion is directed an opportunity

> to cure possibly technical defects in proof which might otherwise make his case le-

---

1. The Court had already dismissed the breach of implied warranty count on statute of limita- tions grounds. Plaintiff has not appealed this dismissal.

gally insufficient. A motion for judgment notwithstanding the verdict made after trial, in the absence of prior notice of the alleged defect, comes too late for possibly curative action, short of a completely new trial. Thus, whether or not the Constitution compels the rule forbidding a party to advance by judgment notwithstanding the verdict motion a ground not first advanced in a motion for directed verdict, the rule is certainly consistent with the general spirit animating the Federal Rules of Civil Procedure. That spirit suggests avoidance of surprises and tactical victories at the expense of substantive interests.

*Wall v. United States,* 592 F.2d 154 (3d Cir.1979); *accord* 5A J. Moore, *Moore's Federal Practice,* ¶ 50.08 (2d ed. 1982).

■ We agree with plaintiff's observation that defendants' counsel could (and should) have stated the basis of their motion for a directed verdict with considerably greater specificity. The sole statement made by defendants' counsel in this regard was less than illuminating:

> I move for a directed verdict on Counts I and the remaining counts, ... under 402(1) [sic] theory which is ... strict liability ... and the negligence count which I believe are the only remaining counts in all of the complaints....[2]

Ordinarily, and standing alone, this motion might not have served as a valid prerequi-site to a motion for judgment n.o.v. as to punitive damages. But the communicative content, "specificity" and notice-giving function of an assertion should be judged in context. *See Hubbell v. Levin,* 395 F.Supp. at 80, *vacated on other grounds,* 537 F.2d 726 (3d Cir.1976). In this case, a close examination of the record shows that, despite the imprecision of the sentences uttered by defendants' counsel at the time of his Rule 50(a) motion for a directed verdict, plaintiff's counsel and the court understood and responded to defendants' counsel as well as if he had been more specific at the time.[3] Immediately after defendants' counsel made the motion, plaintiff's counsel described the counts to which his adversary had referred. The court then stated that [the defendants have], in effect, moved for a directed verdict as to Counts I [negligence], II [strict liability], and IV [punitive damages]; plaintiff's attorney responded, "I think we proved all the elements of both [the strict liability and negligence] counts." Specifically, plaintiff's counsel contended that the record contained evidence sufficient to sustain a finding that defendants were negligent because of inadequate testing of the rear wheel. This colloquy, coupled with the rest of the exchange that preceded the denial of the motion, leads us to conclude that, taken in context, defendants' motion was sufficiently specific to satisfy Rule 50.[4]

**2.** When counsel made this motion, the court had just granted a pending motion to dismiss the breach of warranty count on statute of limitations grounds.

**3.** The colloquy between court and counsel also suggests that this motion was a renewal of one made at the close of plaintiff's case. Because the record is unclear on the point—the earlier motion, if it was made at all, was made at a conference that unfortunately was held off the record—we directed counsel to move the district court pursuant to Fed.R.App.P. 10(e) "for a clarification of what occurred in the district court in this respect and [for] modification of the record ... to conform to the truth." The parties did so, and the district court determined that no clarification or modification was warranted. We interpret the district court's action as reflecting its understanding that defendants complied with the requirements of Rule 50(a).

We note in this regard that Rule 50(a) does not require a defendant to make his motion at the close of plaintiff's case, although that assuredly is the better practice.

**4.** A second reference to defendants' motion for a directed verdict was made after the charge to the jury. During a conference in which the court entertained objections to and requests to modify the charge, the following colloquy took place:

> Mr. Watts [Counsel for Defendants]:
> The second thing is Your Honor, I think I would object to the instruction that permits the punitive damages under the strict liability in this case. It seems to me that there is no testimony that would or no evidence that would support a punitive damage award either in strict liability, but particularly strict liability, nor the negligence count and for that reason I don't think that the punitive

## III.

Defendants' principal contention on appeal is that the evidence was insufficient as a matter of law to sustain the award of punitive damages and that the district court erred in submitting the issue to the jury in the first place.[5] Before turning to that question, however, we first must address their argument that punitive damages are unavailable in this case because, no matter what the evidence, punitive damages are fundamentally inconsistent with a regime of strict products liability in general, and with section 402A in particular.

### A. *The Availability of Punitive Damages in the Strict Liability Context*

■ Although this question is one of first impression in the Virgin Islands, we do not lack guidance. Many courts, both state and federal, have already considered the issue,

and the overwhelming majority have concluded

that there is no theoretical problem in a jury finding that a defendant is liable because of the defectiveness of a product and then judging the conduct of the defendant in order to determine whether punitive damages should be awarded on the basis of 'outrageous conduct' in light of the injuries sustained by the plaintiff. *Hoffman v. Sterling Drug, Inc.*, 485 F.2d 132, 144–47 (3d Cir.1973); *Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255, 263–267 (E.D.Pa.1976). Punitive damage awards provide a useful function in punishing the wrongdoer and deterring product suppliers from making economic decisions not to remedy the defects of the product.

*Neal v. Carey Canadian Mines, Ltd.*, 548 F.Supp. 357 (E.D.Pa.1982) (Bechtle, J.) (construing Pennsylvania law).[6]

---

damages should have been an issue to go to the jury.

The Court: Bear in mind you never made a motion to dismiss.

Mr. Watts: I certainly did, sir.

The Court: When?

Mr. Watts: At the end of the entire case.

The Court: No, sir, I didn't hear it.

Mr. Watts: You will find it in the record. I made a motion to dismiss it first. You granted the warranty count and then I made the motion to dismiss I, III, and IV.

The Court: Yes, you may have. All right.

Mr. Watts: And so—

The Court: I think you did say that. But since you didn't specifically say that, it didn't record with me because I wondered how come you didn't make a motion to dismiss the punitive damages, and I think I may have said that to you.

Mr. Watts: I did.

The Court: That doesn't say I would have dismissed it.

Mr. Watts: I understand.

The Court: I was mixed up. I was thinking you had not made it. You are correct. Next time don't make it in that blanket fashion. That is like a spitball.

Mr. Watts: It certainly wasn't intended to be that way.

The Court: I like you to be more specific but I am not blaming you.

Mr. Watts: Thank you.

We do not suggest that the district court did or was required to treat this exchange as a motion for a directed verdict. *Cf. Lowenstein v. Pepsi-Cola Bottling Co.*, 536 F.2d 9, 11 n. 5 (3d Cir.)

(if district court, with knowledge of all parties, treats a binding request for a jury charge as a motion for a directed verdict, the predicate for a motion for judgment n.o.v. is satisfied), *cert. denied*, 429 U.S. 966, 97 S.Ct. 396, 50 L.Ed.2d 334 (1976). The exchange does confirm our belief that defendants previously had made such a motion and that the district court so recognized.

5. Although defendants argued before the district court that the evidence was also insufficient to support any liability under § 402A, they have not advanced that contention in this Court.

6. *See also Dorsey v. Honda Motor Co.*, 655 F.2d 650 (5th Cir.1981) (Florida law), *opinion modified on petition for rehearing*, 670 F.2d 21 (5th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); *Gillham v. Admiral Corp.*, 523 F.2d 102 (6th Cir.1975) (Ohio law), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976); *d'Hedouville v. Pioneer Hotel Co.*, 552 F.2d 886 (9th Cir.1977); *Johnson v. Husky*, 536 F.2d 645 (6th Cir.1976); *Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255 (E.D.Pa.1976) (Pennsylvania law) (dictum); *Vollert v. Summa Corp.*, 389 F.Supp. 1348 (D.Haw.1975); *Drake v. Wham-O Mfg. Co.*, 373 F.Supp. 608 (E.D.Wis.1974) (Wis.law); *Sturm, Ruger & Co. v. Day*, 594 P.2d 38 (Alaska 1979), *modified*, 615 P.2d 621 (1980), *on rehearing*, 627 P.2d 204 (Alaska), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); *Grimshaw v. Ford Motor Co.*, 119 Cal. App.3d 757, 174 Cal.Rptr. 348 (1981); *Ford*

In addition, this court already has held that the existence of strict products liability in the Virgin Islands does not preclude all examination of fault in the formulation of tort doctrine. In *Murray v. Fairbanks Morse*, 610 F.2d 149, 158 (3d Cir.1979), we considered whether "comparative fault principles can be applied effectively" in "strict products liability actions, where the focus is on the product defect and not on the defendant's personal misconduct." Although defendants in that case argued that the two notions were fundamentally incompatible, we held that "[a] system of comparative fault which proceeds to apportion damages on the basis of causation in no way disturbs the plaintiff's burden of proof. The plaintiff still need only prove the existence of a defect causally linked to the injury." *Id.* at 161. The same rationale applies here: as long as a plaintiff can carry his burden of proof under section 402A, there is no inconsistency in his also being permitted to offer proof regarding the nature of the manufacturer's conduct.

The *Restatement (Second) of Torts* does include a generally applicable provision regarding punitive damages. Section 908(2) declares:

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Nowhere in that section or the comments did the drafters suggest that these principles should not apply to strict products liability,[7] and we concur with the considered opinion of the Court of Appeals for the Fifth Circuit that "[p]unishment and deterrence, the basis for punitive damages ..., are no less appropriate with respect to a product manufacturer who knowingly ignores safety deficiencies in its product that may endanger human life" than in other cases in which "the defendant's conduct shows wantonness or recklessness or reckless indifference to the rights of others." *Dorsey v. Honda Motor Co.*, 655 F.2d 650, 658 (5th Cir.1981) (construing Florida law), *opinion modified on rehearing*, 670 F.2d 21 (5th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982).[8]

Motor Co. v. Home Ins. Co., 116 Cal.App.3d 374, 172 Cal.Rptr. 59 (1981); *Toole v. Richardson-Merrell Inc.*, 251 Cal.App.2d 689, 60 Cal. Rptr. 398 (1967); *Moore v. Jewel Tea Co.*, 116 Ill.App.2d 109, 253 N.E.2d 636 (1969), *aff'd*, 46 Ill.2d 288, 263 N.E.2d 103 (1970); *American Laundry Machinery Indus. v. Horan*, 45 Md. App. 97, 412 A.2d 407 (Md.Ct.Spec.App.1980); *Grvc v. Dayton-Hudson Corp.*, 297 N.W.2d 727 (Minn.), *cert. denied*, 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980); *Rinker v. Ford Motor Co.*, 567 S.W.2d 655 (Mo.App.1978); *Leichtamer v. American Motors Corp.*, No. 5223 (Ohio Ct.App. July 30, 1980), *aff'd*, 67 Ohio St.2d 456, 424 N.E.2d 568 (1981); *Heil Co. v. Grant*, 534 S.W.2d 916 (Tex.Civ.App.1976); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437 (1980). *But see Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832 (2d Cir.1967) (suggesting, but not holding, that New York law should not allow punitive damages in a strict products liability case); *Gold v. Johns-Manville Sales Corp.*, 553 F.Supp. 482 (D.N.J. 1982) (holding that New Jersey law would not permit punitive damages); *Walbrun v. Berkel, Inc.*, 433 F.Supp. 384 (E.D.Wis.1976) (Wisconsin law). For a compilation of the case law, see Annot., Allowance of Punitive Damages in

Products Liability Case [sic], 13 A.L.R. 4th 52 (1982).

7. We note in passing that the drafters did state that "[p]unitive damages are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence. And they are not permitted merely for a breach of contract." Because this formulation merely "codifies" traditional tort law, however, we are reluctant to rely on the maxim "expressio unius est exclusio alterius" to infer that punitive damages are necessarily permissible in any other circumstances not specifically mentioned.

8. *Cf. Murray v. Fairbanks Morse*, 610 F.2d 149, 157 (3d Cir.1979) (citations omitted):

[A]lthough the Virgin Islands comparative negligence statute does not expressly authorize its application to strict products liability actions, it does not expressly forbid it. In such a case, "it is just as reasonable to assume the passage of a comparative negligence statute was not designed to preclude a comparison of fault in strict liability actions, ... and to extrapolate that if the principle is helpful and fair, 'it should be applied by [a] court as a principle of common law ....'"

Some courts and commentators, however, have suggested that the policies underlying punitive damages are so incompatible with those animating strict products liability that punitive damage awards should not be permitted against defendants found liable under 402A.[9] These arguments essentially break down into three groups: contentions that punitive damages will upset the delicate balance struck in the creation of a strict products liability regime, assertions that the goals of punitive damages are unachievable in the strict products liability context, and arguments that the imposition of punitive damages in 402A cases will have extremely undesirable economic and social consequences. We disagree that these considerations warrant our precluding the award of punitive damages, and we discuss each in turn.

1. *Would the Availability of Punitive Damages Disrupt the Regime of Strict Products Liability?*

Defendants' first argument is that punitive damages are inherently inconsistent with a theory of strict products liability. Punitive damages, defendants note, " 'evolved in the context of a one-on-one relationship and were viewed as a form of punishment—a deterrent for intentional and outrageous conduct.' " Br. at 25 (quoting Ghiardi & Koehn, *Punitive Damages in Strict Liability Cases*, 61 Marq.L.Rev. 245, 248 (1977)). The touchstone of section 402A, by contrast, is that the character of the manufacturer's conduct is essentially irrelevant to its liability—only the condition of the product is to be considered by the trier of fact. *See Murray v. Fairbanks Morse*, 610 F.2d 149, 157 (3d Cir.1979). Thus, defendants assert, the two claims should not be joined "[b]ecause the strict liability claim expressly relaxes the proof

requirements concerning the conduct of the defendant [while] the claim for punitive damages refocuses attention to the conduct of the defendant...." *Id.*

We reject the notion that punitive damages are theoretically inconsistent with strict products liability. While it is true that section 402A eschews the culpability of defendants' conduct as a factor in determining liability, it does not do so because focusing on culpability is always inappropriate. Indeed the drafters of the Restatement explicitly noted that 402A "does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved." Comment a. Rather, the rule is intended to expand recovery by circumventing the restrictions imposed by fault-based standards. *See Murray v. Fairbanks Morse, supra,* 610 F.2d at 158. The fact that some sellers therefore will be found liable in the absence of fault does not mean that those who are at fault—and outrageously so—should not be punished.[10] *Accord Neal v. Carey Canadian Mines, Ltd.,* 548 F.Supp. 357, 378 (E.D.Pa. 1982); *Thomas v. American Cystoscope Makers, Inc.,* 414 F.Supp. 255, 264 n. 13 (E.D.Pa.1976) (dictum) ("this Court knows of no sound reason" why punitive damages should be precluded when liability is predicated on 402A); *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 446 (1980).

One court, however, recently has advanced an economics-based objection to allowing punitive damages in a 402A action:

[T]he allowance of punitive damages would warp the valuation process which is implicit in the litigation process. That is, the product's price should reflect the cost of accidents or the cost of accident avoidance mechanisms in order that the

---

**9.** Defendants briefly raise only some of these arguments; we have gone beyond their contentions because of the importance of the issue.

**10.** Defendants also contend that a jury is likely to be confused by the presence of the two concepts in the same case. *Accord Gold v. Johns-Manville Sales Corp.,* 553 F.Supp. 482, 485, (D.N.J.1983). But that argument ignores the fact that many plaintiffs plead alternative

theories of negligence and strict products liability. Thus juries are frequently asked, as was the case here, simultaneously to consider both fault and nonfault based standards of liability. Moreover, we are convinced that a properly instructed jury will be able to distinguish between the standards applicable to awards of compensatory and punitive damages.

market may assess the usefulness of the product.... The assessment of punitive damages upon the manufacturer and distributors can be analyzed as the imposition of costs for poor managerial decisions. These costs should not be spread to the buying public through an adjustment of the product's price. To do so will deflate the usefulness of the product on the basis of facts which do not relate to the product itself.

*Gold v. Johns-Manville Sales Corp.,* 553 F.Supp. 482, 484 (D.N.J.1983) (citations omitted). Although the argument is attractive, it is predicated on a questionable premise, for it is not necessarily true that an award of punitive damages will be spread to the public through an adjustment of the price. In order for such spreading to occur, not only would a manufacturer have to be able to forecast punitive damages awards against him, but the market structure also would have to be such that he had sufficient unutilized market power to pass on the increased costs. Unless an entire competitive industry was behaving similarly (i.e., engaging in the same kind of opprobrious conduct and forecasting), a manufacturer would seem to be unable to afford to pass on the costs.[11] *Accord Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 452 (1980).

### 2. Does the Strict Liability Context Limit the Effectiveness of Punitive Damages?

Section 908(1) of the *Restatement (Second) of Torts* makes clear that

[p]unitive damages are damages, other than compensatory or nominal damages, awarded against a person *to punish him for his outrageous conduct and to deter*

*him and others like him from similar con-duct in the future.*

(Emphasis added.); *see Herman v. Hess Oil Virgin Island Corp.,* 524 F.2d 767, 772 (3d Cir.1975) ("[I]t is proper to assess punitive damages as a deterrent and an example to the community."). While few, if any, courts, have challenged these goals, some courts and commentators have suggested that the connection between punitive damages and the goals of punishment and deterrence will be attenuated in the strict products liability context.

Proponents of this argument point out that the magnitude of recent jury verdicts, coupled with the potential for a single design defect to serve as the template for hundreds or thousands of defective, injury-causing products, means that a manufacturer may be liable for many millions of dollars merely as compensation to injured victims. *See* 3 L. Frumer & M. Friedman, *Products Liability* § 33.01[7]. Thus, the argument runs, compensatory damages have reached such a level in products-liability litigation that, despite their more limited purpose, they have begun to perform the functions heretofore performed by punitive damages. Manufacturers, the argument concludes, therefore already have every incentive to insure that their products are as safe as possible. Indeed the Court of Appeals for the Second Circuit observed as early as 1967:

Many awards of compensatory damages doubtless contain something of a punitive element, and more would do so if a separate award for exemplary damages were eliminated. Even though products liability insurance blunts the deterrent effect of compensatory awards to a considerable extent, the total coverage under such policies is often limited, bad experience is

---

**11.** Law-and-economics scholars are divided on the effect and appropriateness of punitive damages. *See generally Punitive Damages,* 56 So. Cal.L.Rev. 1 (1982). While the debate focuses on the availability of punitive damages generally, a number of the proponents of punitive damages have endorsed their use in the strict products liability context. *See, e.g.,* Cooter, *Economic Analysis of Punitive Damages,* 56 So.Cal.L.Rev. 79, 95 ("[T]o recover punitive

damages, the economic model suggests that the consumer should also be required to prove that the manufacturer knowingly caused the defect."); Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1257 (1976) (concluding that "punitive damages may be usefully employed in products liability litigation to punish and to deter the marketing of defective products in flagrant disregard of the public safety").

usually reflected in future rates, and insurance affords no protection to the damage to reputation among [users, consumers, and distributors] which an instance like the present must inevitably produce.

*Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 841 (2d Cir.1967). Thus the *Roginsky* court concluded that punitive damages were unnecessary to punish and deter the reckless marketing of defective products.[12]

We are not persuaded that limiting recovery to compensatory damages will, in all cases, provide an effective deterrent against the type of wrongful conduct for which punitive damages are usually available. For example, the cost of litigation relative to the likely recovery may deter victims of product defects from suing the manufacturer, even under a regime of strict liability, where products causing numerous minor injuries are involved. The availability of punitive damages to those who do sue may offset the decreased deterrence attributable to those who thus could but do not. Similarly, consumers will not always be aware of the source of an injury caused by a product defect, *see Sturm, Ruger & Co. v. Day*, 594 P.2d 38, modified, 615 P.2d 621 (1980) *on rehearing*, 627 P.2d 204 (Alaska), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981); Owen, *Punitive Damages in Products Liability Litigation*, 74 Mich.L.Rev. 1258, 1287–95 (1976) (also noting the expense of litigation), or they may wrongfully attribute the accident to their own clumsiness; the manufacturer's reprieve in such cases will be offset by the availability of punitive damages in other cases. Finally, under existing doctrine, compensatory damages may prove an inadequate deterrent even when victims do bring suit. Current doctrine does not, for example, allow the estate of a decedent killed by a defective product to recover the value of life to the decedent himself; recovery is instead limited to the pecuniary loss to those immediately surrounding the dece-

dent. In many instances, this doctrine may lead to inadequate compensation. In addition, those peripherally injured by accidents to another generally are not allowed to bring suit, yet their loss may be, in moral or practical terms, extremely substantial. *See* Owen, *Civil Punishment and the Public Good*, 56 So.Cal.L.Rev. 103, 113 (1982). While punitive damages may not be a logically perfect method of remedying these perhaps unavoidable flaws in our system of justice, they are a useful surrogate not necessarily precluded by a strict products liability regime.

### 3. Will Punitive Damages Have Undesirable Economic and Social Consequences?

Perhaps recognizing that mere redundancy would not be sufficient to supersede considerations in favor of allowing punitive damages, the *Roginsky* court predicted that the availability of such damages would have unfortunate results. The court noted that there are frequently numerous potential plaintiffs with claims arising from the same defect in design or manufacture; if each such plaintiff can recover punitive damages, the court warned, the aggregate recovery could be "catastrophic."

If liability policies can protect against this risk as several courts have held, the cost of providing this probably needless deterrence, not only to the few manufacturers from whom punitive damages for highly negligent conduct are sought but to the thousands from whom it never will be, is passed on to the consuming public; if they cannot, as is held by other courts and recommended by most commentators, a sufficiently egregious error to one product can end the business life of a concern that has wrought much good in the past and might otherwise have continued to do so in the future, with many innocent stockholders suffering extinction of their

---

12. We note, however, that the "only conclusion" that the *Roginsky* court drew from its analysis was that a more stringent standard of proof would be imposed under New York law. *Id.* at 852 (denying rehearing); *see infra* at Part III.B.

investments for a single management sin. *Id.* at 841.[13]

Although we recognize that the effect of punitive damages may be harsh, we find somewhat excessive the *Roginsky* court's dire predictions about the consequences of allowing punitive damages. First, even assuming that policy considerations would permit manufacturers to insure against punitive damages,[14] it is not clear that such insurance would necessarily emasculate the effectiveness of the remedy or result in "needless deterrence." Rather, a 1976 study by the Department of Commerce noted that recent increases in the number of products liability claims, policy cancellations, insurance premiums, and average loss per claim have contributed to a situation in which manufacturers are finding it more and more difficult to obtain adequate coverage. *See* Bureau of Domestic Commerce, U.S. Department of Commerce, *Product Liability Insurance—Assessment of Related Problems and Issues* (1976). The upshot is that many manufacturers are making stronger efforts to improve design and quality control. *Id.* at 9. As one commentator has noted, "these developments compel the conclusion that products liability litigation is increasingly forcing manufacturers to improve product safety even when they are insured against claims for product injuries." Owen, *supra,* 74 Mich.L.Rev. at 1310.

More importantly, we do not share *Roginsky's* in terrorem vision of the consequences of punitive damages for which insurance is unavailable. It is, of course, possible that "a sufficiently egregious error as to one product" could result in the demise of its manufacturer, but such a result is not inevitable.[15] Comment e to section 908 of the Restatement makes clear that one factor to be taken into account in calculating punitive damages

is the existence of multiple claims by numerous persons affected by the wrongdoer's conduct. It seems appropriate to take into consideration both the punitive damages that have been awarded in prior suits and those that may be granted in the future, with greater weight being given to the prior awards. In a class action involving all claims, full assessment of the punitive damages can be made.[16]

**13.** *Cf.* Note, *Class Certification in Mass Accident Cases Under Rule 23(b)(1),* 96 Harv.L.Rev. 1143, 1145–46 (1983) (arguing for class treatment of mass accidents where possible in part to avoid inequitable distribution and aggregation of punitive damages).

**14.** It would seem obvious that the availability of insurance to cover awards of punitive damages would undercut their punitive and deterrent effect. Indeed the Court of Appeals for the Fifth Circuit has so recognized in refusing to enforce such provisions of automobile insurance policies:

Where a person is able to insure himself against punishment he gains a freedom of misconduct inconsistent with the establishment of sanctions against such misconduct. It is not disputed that insurance against criminal fines or penalties would be void as violative of public policy. The same public policy should invalidate any contract of insurance against the civil punishment that punitive damages represent.

*Northwestern National Casualty Co. v. McNulty,* 307 F.2d 432, 440 (5th Cir.1962); *accord Smith v. Merchant Mut. Bonding Co. (In re Guardianship of Smith),* 211 Kan. 397, 405, 507 P.2d 189, 196 (1973); Owen, *supra,* 74 Mich.L. Rev. at 1312–13; Ellis, Fairness and Efficiency

in the Law of Punitive Damages, 56 So.Cal.L. Rev. 1, 74, 75 (1982). Some courts, however, have permitted such insurance. *See, e.g., Lazenby v. Universal Underwriters Ins. Co.,* 214 Tenn. 639, 383 S.W.2d 1 (1964); cases cited Owen, *supra,* 74 Mich.L.Rev. at 1312 n. 267.

**15.** Nor is such a result necessarily untenable. *See* infra note 17. We note, however, that no empirical evidence has been offered that Roginsky's forebodings have been realized in the sixteen years since it was written. See *State ex rel. Young v. Crookham,* 290 Or. 61, 618 P.2d 1268 (1980) (apprehension of corporate annihilation by awards of punitive damages is exaggerated).

**16.** At least one court has questioned whether these practical problems can be overcome. *See Roginsky, supra,* 378 F.2d at 839–40. In light of our conclusion that plaintiff did not adduce evidence sufficient to sustain his claim for punitive damages, however, *see infra* Part III.C., we need not determine whether or to what extent a court, before submitting the claim to the jury, should consider prior awards of punitive damages against a defendant for recklessly marketing the same defective product. *See generally* Owen, *supra,* 74 Mich.L.Rev. at 1319

Moreover, this court has previously recognized that both the wealth of the defendant, see *Herman v. Hess Oil, supra,*[17] and the size of compensatory damages, *see Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1279 (3d Cir.1979) (in banc), should be taken into account in assessing punitive damages. "Thus, corporate defendants are protected from excessive punitive damage awards through judicial control both at the district court and appellate levels." *Neal v. Carey Canadian Mines, supra,* 548 F.Supp. at 377.

### B. Standard of Proof

Although we reject each of the various arguments against awarding punitive damages in the strict liability context, we agree with Judge Friendly's observation in *Roginsky, supra,* that "the consequences of imposing punitive damages in a case like the present are so serious" that "particularly careful scrutiny" is warranted. 378 F.2d at 852 (denying petition for rehearing); *cf.* Comment, *Criminal Safeguards and the Pu-*

*nitive Damages Defendant,* 34 U.Chi.L.Rev. 408, 417 (1967) ("If one accepts the proposition that the consequences of punitive damages can be 'momentous and serious,' then justice requires increasing the burden of persuasion of the plaintiff in a punitive damages action.") We therefore hold under Virgin Islands law that a plaintiff seeking punitive damages, at least in an action in which liability is predicated on section 402A, must prove the requisite "outrageous" conduct by clear and convincing proof.[18] *Accord Wangen v. Ford Motor Co., supra;* Model Uniform Product Liability Act § 120(A), 44 Fed.Reg. 62748 (1979).[19]

### C. The Standard Applied

■ Applying the "clear and convincing" standard to the facts of this case, we conclude that the district court should have entered judgments n.o.v. on the punitive damages issue for all three defendants, and not just for American Honda. We recognize, of course, that we are bound to "view all the evidence and the inferences reason-

(suggesting increased judicial control in the assessment of punitive damages).

17. Although *Herman* involved a situation in which evidence of the defendant's wealth was introduced by plaintiff in order to get higher punitive damages, such evidence can cut both ways. For example, a jury might decide that a defendant's financial position, as a result of other awards of punitive damages for the same conduct, is so precarious that a sizeable award of punitive damages would be inappropriate.

Of course, a jury might reasonably decide, when faced with such information, that a bankrupting award is nevertheless appropriate. Although the Second Circuit posited the case in which an otherwise "good" manufacturer is thereby driven out of business, the situation is equally likely in which the manufacturer is one whose success and financial health is directly attributable to its willingness recklessly to market an unsafe, but therefore cheaper and more popular, product. Thus an award of punitive damages may have the effect of redressing an unfair and socially undesirable competitive advantage.

We also take issue with the Second Circuit's hypothesis that the innocent victim of a punitive damages award will be the manufacturing corporation's innocent shareholders. It is true, of course, that the shareholders may ultimately bear the burden of such an award, *see supra* pp. 837–838, and it is also true that they are

innocent to the extent that it was actually management or an employee who was responsible for the conduct justifying the award. At the same time, it *is* the shareholders who have benefited from any such conduct that has redounded to the manufacturer's fiscal advantage. Moreover,

> the loss of investment and the decline in value of investments are risks which investors knowingly undertake, and investors should not enjoy ill-gotten gains. There is a public interest to encourage shareholders and corporate management to exercise closer control over the operations of the entity, and the imposition of punitive damages may serve this interest.

*Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437, 453–54 (1980).

18. Even with such proof, however, a plaintiff is not entitled to recover such damages as a matter of right. Rather the Restatement is quite clear that the award is discretionary with the trier of fact. *See* § 908 comment d.

19. Section 120(A) provides:

> Punitive damages may be awarded to the claimant if the claimant proves by clear and convincing evidence that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers, or others who might be harmed by the product.

ably drawn therefrom" in plaintiff's favor, *see Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1273 (3d Cir.1979) (in banc), and that "[o]ur limited function at this point is to ascertain from a review of the record whether there is sufficient evidence to sustain the verdict of the jury on this issue," *id.* It nevertheless appears to us that the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief." *Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir.1969).

Plaintiff's evidence allegedly supporting his claim for punitive damages essentially consisted of the following:

1. The rear wheel of his motorcycle collapsed from a thirty-five mile per hour impact with a ditch four inches deep;

2. The particular wheel of plaintiff's motorcycle suffered from an inherent lack of strength as evidenced by the fact that it weighed sixteen percent less than several other randomly sampled rear wheels of motorcycles of the same model;

3. The owner's manual represented the CB750 as a high-speed touring motorcycle but provided no warning that the rear wheel might collapse upon the type of impact that occurred in this case;

4. Although the owner's manual instructed users to set and maintain the tension of the motorcycle's shock absorbers and wheel spokes, the manual did not warn that the failure to do so might result in the collapse of the wheel;

5. Defendants merely spot-checked rear wheels during the assembly process and did not crush test or weigh each wheel;

6. Plaintiff's expert witness testified that the above evidence constituted defective manufacture and a failure adequately to inspect or to warn; and

7. Plaintiff's expert concluded that defendant's conduct manifested a "colossal disregard for the safety of the users of the motor vehicle," App. II at 125–26.[20]

Plaintiff contends that the jury was entitled to infer from this evidence that defendants recklessly disregarded his rights and safety as a user of the motorcycle. We cannot agree. As we have suggested above, section 908 of the *Restatement* declares that reckless or outrageous conduct on the part of the defendant is the touchstone of punitive damages. *See Berroyer v. Hertz,* 672 F.2d 334 (3d Cir.1982); *Chuy v. Philadelphia Eagles, supra,* 595 F.2d at 1277. Although section 908 does not elaborate on the kind of conduct for which punitive damages are appropriate, comment b refers to section 500, which in turn provides:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

The commentary accompanying section 500 explains further:

> Recklessness may consist of either of two different types of conduct. In one the actor knows, or has reason to know ... of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk. In the other the actor has such knowledge, or reason to know, of the facts, but does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so. An objective standard is applied to him and he is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.
>
> . . . .
>
> For either type of conduct, to be reckless it must be unreasonable; but to be

**20.** Although not raised on appeal, the admissibility of this statement under Fed.R.Evid. 702 or 704 is open to serious question.

reckless, it must be something more than negligent. It must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent. It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence.

We have examined the evidence; viewed in the light most favorable to plaintiff, it does not show that the conduct of any defendant was outrageous or reckless. Indeed we discern no basis upon which the jury could have concluded that defendants knew or had reason to know that the rear wheel of Acosta's motorcycle was defective in design or manufacture and that they decided not to remedy the defect in conscious disregard of or indifference to the risk thereby created. Although the wheel had been used in over 275,000 motorcycles, and the model first offered in 1970 (six years before plaintiff's accident), there was no evidence of previous consumer complaints or lawsuits that might have called to defendants' attention that there might be a problem. Moreover, plaintiff offered no proof that defendants developed or failed to modify the engineering designs for the rear wheel of the CB750 with any knowledge or reason to know of its alleged lack of safe-

ty.[21] Such matters would have been admissible on the punitive damages issues.

In short, a jury could not have reasonably concluded that the evidence by the clear and convincing standard showed defendants to have acted with reckless disregard for the safety of users of the CB750.[22] Accordingly, we hold that the district court should have granted defendants' motions for directed verdicts on the punitive damage claim and that it was error to deny the subsequent motions for judgment n.o.v. on behalf of Honda and Daido Kogyo.[23]

## IV. Defendants' Objections to the Court's Instructions Regarding Liability and Compensatory Damages

In addition to their attack on the award of punitive damages, defendants also attack the compensatory damages verdict. They base their attack on two grounds.

### A. The District Court's Decision not to Charge the Jury on Prolonged Safe Use

Defendants contend that the district court erred in failing to grant their request for an instruction that the prolonged safe use of the motorcycle by two previous owners over a six-year period was "persuasive evidence" that the motorcycle was not defective.[24] We do not agree that the court

---

**21.** In fact, defendants adduced evidence, which was not contradicted, that pre-production testing followed standard procedures, including on-the-road testing and laboratory testing (including wheel crushing to determine durability), and that samples from each production run of completed motorcycles were subjected to final dynamometer tests before shipping. Apparently, none of these tests suggested that a problem might exist.

**22.** The clear and convincing standard of proof we announce today pertains to the degree of proof needed to be found by the trier of fact before it assesses punitive damages. The standard is not applicable to an appellate court in reviewing the determination of the trier of fact that there was or was not clear and convincing evidence of outrageous conduct. Rather the applicable standard of review on appeal is whether the record "is critically deficient of that minimum quantum of evidence from which a jury might reasonably afford relief."

*Denneny v. Siegel,* 407 F.2d 433, 439 (3d Cir. 1969).

**23.** Defendants also contend that the uniquely "personal" nature of punitive damages precluded their assessment jointly and severally against all defendants. Because we conclude that plaintiff did not present sufficient evidence as a matter of law to sustain his claim for punitive damages against *any* defendant, we need not address this additional argument.

**24.** The phrase "persuasive evidence" derives from *Hubschman v. Antilles Airboats, Inc.,* 14 V.I. 366, 402 (D.V.I.1977). To the extent that defendants read "persuasive evidence" as used in *Hubschman* to mean that prolonged safe use of a product necessarily has greater weight than other evidence of the existence or absence of a defect, we disagree. Rather, as explained by the decision on which *Hubschman* purported to rely, "prolonged safe use of a product is evidence of a lack of defect but is not conclu-

was obliged to grant the request. Defendants essentially were asking the court to comment on the evidence. The decision so to comment, however, lies within the discretion of the court, *see Quercia v. United States,* 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933); Saltzburg, *The Unnecessarily Expanding Role of the American Trial Judge,* 64 Va.L.Rev. 1, 40–41 (1978); *see also United States v. Anton,* 597 F.2d 371 (3d Cir.1979), and we cannot agree that the district court abused its discretion here. The fact of prolonged safe use was quite clear from the testimony;[25] the court gave defense counsel permission to argue the significance of prolonged safe use; and the court's instruction on circumstantial evidence was sufficiently broad to enable counsel to do so. We therefore cannot agree with defendants' assertion that the absence of the instruction "prejudiced the defendants by diminishing the importance of this concept in the minds of the jurors." Reply Br. at 14.

### B. *The District Court's Charge on Contributory Negligence*

■ Defendants also take issue with the court's instruction to the jury that it could not find plaintiff, an off-duty policeman, contributorily negligent even if plaintiff was proceeding at high speed over roads known to be full of potholes, provided that his high speed was (as one witness had testified) the result of his chasing an escaped felon.[26]

Defendants assert that the instruction was erroneous in two respects. First, they contend that the instruction confused the jury by failing adequately to distinguish between contributory negligence, which is

relevant to defendants' liability on the negligence count, and comparative fault, which is relevant to defendants' liability under section 402A.[27] Thus, according to defendants, the jury probably understood the instruction to mean that findings of contributory negligence *and comparative fault* would be precluded if the jury were to find that plaintiff had been engaged in high-speed pursuit at the time of the accident. Since the jury in fact found no fault on the plaintiff's part, and defendants assert that "the evidence can only support that plaintiff was operating the motorcycle at a high speed when he lost control ...," Brief at 37, the defendants conclude that the jury must have excused plaintiff's conduct, which would be wrong.

Defendants would have us draw a conclusion that simply is not inexorable. Although it is possible to infer that the jury found no comparative fault because it excused plaintiff's high speed, it is at least as likely that the jury concluded, based on the conflicting evidence, that Acosta had not been speeding at all. That interpretation of the evidence, which finds support in the record, would also lead to a finding that plaintiff was not at fault. Indeed that interpretation of the jury's verdict may be more likely, given the court's clear instruction that the question whether plaintiff was chasing a felon was totally irrelevant to the 402A count and the issue of comparative fault. *See* App. V. at 24.

Defendant's next objection is that the district court violated Fed.R.Civ.P. 51 by failing to inform counsel that it intended to given an instruction permitting the jury to find plaintiff's conduct excused.[28] Again,

---

sive." *Bruce v. Martin-Marietta Corp.,* 544 F.2d 442, 447 (10th Cir.1976).

**25.** Indeed defendants' expert testified that Honda had received no complaints from either former owner about this motorcycle's performance.

**26.** One defense witness, a police officer, testified that plaintiff told him that the accident occurred when plaintiff was pursuing an escaped felon. Plaintiff denied making such a statement; he testified that he had been referring to an earlier incident.

**27.** We previously have held that, under Virgin Islands law, principles of comparative fault are applicable in cases brought under § 402A. Accordingly, "the causal contribution of the product defect and the plaintiff's conduct are weighed by the trier of fact in apportioning damages." *Murray v. Fairbanks Morse,* 610 F.2d 149, 164 (3d Cir.1979).

**28.** Rule 51 provides in full:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written

we must disagree. As defendants acknowledge in their brief, a failure to comply with Rule 51 warrants reversal only if it has resulted in prejudice to one of the parties. *See Bradshaw v. Thompson,* 454 F.2d 75, 81 (6th Cir.), *cert. denied,* 409 U.S. 878, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).[29] Although defendants assert that such prejudice occurred here, the only support they offer are the conclusory statements that counsel was "misled" into delivering a "contradictory argument," Br. for Cross-Appellants at 37, and that the instruction "severely undermined the credibility of counsel," Reply Br. at 14. Without more, we will not order a new trial.

## V. *Attorney's Fees*

Under Virgin Islands law,

[t]he measure and mode of compensation of attorneys shall be left to the agreement, expressed or implied, of the parties; but there shall be allowed to the prevailing party in the judgment such sums as the court in its discretion may find by way of indemnity for his attorneys fees in maintaining the action or defenses thereto.

V.I.Code Ann. tit. 5, § 541(b) (1967). Pursuant to this section, plaintiffs petitioned for attorneys fees; the district court granted the petition and awarded plaintiff $33,-750. We vacate and remand on this point.

■ Defendants challenge the award on three grounds, the first two of which we do not accept. First, they assert that plaintiff's retention of counsel on a contingency basis precludes an award at all. "Plaintiff bargained and agreed in advance of trial as to how much compensation his attorney would receive and any indemnification for attorney's fees awarded to plaintiff by the District Court results in giving plaintiff something in excess of his bargain." Br. for Cross-Appellants at 39. We do not agree. As plaintiff points out, section 541(b) provides for the award of attorneys fees as a cost of prosecuting or defending a civil action. As such, they are "intended to be an indemnification of the prevailing party for a fair and reasonable portion of his attorney's fees incurred in the prosecution or defense of the action." *Lucerne Investment Co. v. Estate Belvedere, Inc.,* 411 F.2d 1205, 1207 (3d Cir.1969). Although we cannot accept plaintiff's suggestion that he must therefore be compensated to the full extent of his obligations to his counsel, *id.; see infra,*[30] we do not believe that attorney's fees are any less a cost of litigation for a prevailing party who has secured counsel by promising a percentage of any recovery. Moreover, such a conclusion would be contrary to our statements in *Lindy Brothers Builders, Inc. v. American R & S Sanitary Corp. (Lindy I),* 487 F.2d 161, 168 (3d Cir.

requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.

**29.** A more recent decision of the Court of Appeals for the Sixth Circuit has explained cogently the rationale for the prejudice requirement:

On the one hand, the Rule promotes intelligent advocacy by opposing counsel. With the knowledge of which requests for instructions the court plans to grant and which it

plans to deny, both counsel can pattern their closing arguments on the points of law that will be explained to the jury in the final charge.... On the other hand, the Rule preserves a trial court's discretion to modify a final charge up to the time of its actual delivery to the jury. Such discretion is needed because, as experience teaches, closing arguments themselves occasionally raise matters which affect the content of the proposed instructions.... Given the balance struck by Rule 51, it follows that a trial court's reversal of a decision on a jury instruction request after a counsel's closing argument does not automatically necessitate a new trial.

*Estate of Lutren v. Chesapeake & O.R.R.,* 592 F.2d 941, 945 (6th Cir.1979).

**30.** Indeed manifest unfairness could result if a losing party were bound by its adversary's fee arrangements.

1973), and *Lucerne Investment, supra,* 411 F.2d at 1207, that the contingency of compensation is one factor to be considered in computing a fee award. *See also Estien v. Christian,* 507 F.2d 61, 64 n. 3 (3d Cir.1975) (remanding a fee award under section 541(b) for reconsideration in light of *Lindy I* and noting that "[t]his record does not disclose whether or not defendant ... had arranged to compensate his attorney on a contingent basis.").

■ Defendants also object that the district court erred in using a multiplier of fifteen percent to increase the lodestar. We reject this contention as well. Awards of attorney's fees under section 541(b) are a matter within the discretion of the district court, *Estien v. Christian, supra,* 507 F.2d at 63, and are to be reversed only if that discretion has been abused, *Lucerne Investment, supra,* 411 F.2d at 1207. In this case, the district court properly followed the precepts of *Lindy I* in computing the lodestar: the court considered the number of hours plaintiff's counsel spent on the case and the value of those services at a reasonable hourly rate.[31] *See Lindy I, supra,* 498 F.2d at 167.[32] Again, following *Lindy I,* the court then evaluated the contingent nature of plaintiff's success and the quality of counsel's work in order to arrive at a reasonable fee award.[33] The court noted that plaintiffs' success was far from certain (the court characterized the case as a "battle of the experts" and a "cliff hanger") and attributed that success in part to counsel's thorough preparation. Given these findings, the use of a fifteen percent multiplier was within the sound discretion of the court.

31. The court estimated counsel had spent 390.8 hours on the case (the court reduced by 29 hours the estimate presented by counsel) and valued the time at $75 per hour. The resulting figure is $29,310.

32. We held in *Estien v. Christian, supra,* that the *Lindy I* factors apply when computing fee awards under § 541(b).

33. *Lindy I* explained that two factors other than time and rate are relevant in determining a reasonable fee award:

■ We nevertheless must agree with defendants' contention that a remand of the attorneys fees issue is appropriate, in light of our disposition of the punitive damages claim. Although the district court did not state that the amount of plaintiff's recovery was a factor in the fee award, we assume that it did so in light of *Lindy I's* direction that the "amount of the recovery obtained" is to be considered in evaluating the quality of counsel's work, 487 F.2d at 168. Since our vacatur of the award of punitive damages has reduced substantially plaintiff's recovery, an adjustment of the fee award may be warranted. *See Berroyer v. Hertz,* 672 F.2d 334, 342 (3d Cir.1982). *Cf. Hensley v. Eckerhart,* —— U.S. ——, 103 S.Ct. 1933, 1940–41, 76 L.Ed.2d 40 (1983) (district court awarding fee under 42 U.S.C. § 1988 must take into account the extent to which the prevailing party succeeded on the merits). We will remand for that purpose.

## VI. *Conclusion*

For the foregoing reasons, we will reverse the judgment of the district court denying Honda's and Daido Kogyo's motions for judgment n.o.v. on the award of punitive damages and the district court will be directed to enter judgment for Honda and Daido Kogyo on that claim. We will vacate the award of attorney's fees and remand the case to the district court for reconsideration of that award in light of our disposition of the punitive damages issue. In all other respects, the judgment of the district court will be affirmed.

The first of these is the contingent nature of success .... in assessing the extent to which the attorney's compensation should be increased to reflect the unlikelihood of success, the district court should consider any information that may help to establish the probability of success.... The second additional factor the district court must consider is the extent, if any, to which the quality of an attorney's work mandates increasing or decreasing the amount to which the court has found the attorney reasonably entitled.
*Lindy I, supra,* 437 F.2d at 168.