**SCHREIBER FOODS, INC., Plaintiff,**

v.

**BEATRICE CHEESE, INC. and Kustner Industries, S.A., Defendants.**

Schreiber Foods, Inc., Plaintiff,

v.

Great Lakes Cheese Co., Inc., Great Lakes Cheese of La Crosse Wisconsin, Inc., and Great Lakes Cheese of Wisconsin, Inc., Defendants.

Nos. 97–C–11, 97–C–566.

United States District Court, E.D. Wisconsin.

March 30, 2000.

Ralph A. Weber, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, WI, Michael Mazza, Niro, Scavone, Haller & Niro, Chicago, IL, for plaintiff.

Kathryn Keppel, Gimbel, Reilly, Guerin and Brown, Milwaukee, WI, Harold E. Wurst, Darby & Darby, Los Angeles, CA, Paul Fields, Darby & Darby, New York City, James L. Quarles, William F. Lee, William G. McElwain, Hale and Dorr, Washington, DC, for defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

In this patent infringement action, plaintiff Schreiber Foods, Inc. alleged that defendants Beatrice Cheese, Inc.; Kustner Industries, S.A.; and the three Great Lakes Cheese defendants infringed various claims of U.S.Patent Numbers 5,440,860 (the '860 patent) and 5,701,724 (the '724 patent). On August 24, 1998, a jury found defendants liable for willful infringement of all but one of the asserted claims.[1] Concurrent with the jury trial, I heard evidence regarding alleged inequitable conduct by plaintiff before the Patent Office, which is a matter to be decided by the court. During the trial, defendants orally moved for judgment as a matter of law (JMOL), arguing that: (1) there is no literal infringement of the disputed claims of the '860 and '724 patents; and (2) there is no infringement of the disputed claims under the doctrine of equivalents. I reserved decision on the motion. Additionally, regarding the court trial portion of the case defendants formally moved for judgment that plaintiff committed inequitable conduct, thereby rendering the '860 and '724 patents unenforceable. I reserved decision on this motion and took the bench trial issue under advisement.

After the verdict, defendants renewed their JMOL motion, arguing, *inter alia*, that prosecution history estoppel precludes a finding of infringement under the doctrine of equivalents. In an earlier decision and order, I concluded that prosecution history estoppel does not preclude such a finding. (Decision and Order of 10/26/99.) I now address defendants' remaining arguments as to literal infringement and infringement under the doctrine of equivalents. I also decide the inequitable conduct bench trial issue.

### I. BACKGROUND

The patents at issue are directed to machinery for packaging processed cheese in hermetically sealed individual slices, and methods associated therewith. In this case, whether defendants infringed literally or under the doctrine of equivalents turns upon only two limitations in the

---

1. The jury found that defendants infringed claims 1 and 2 of the '860 patent, and claims 14, 15, 18, 21, 24, and 25 of the '724 patent. Some were method claims, and others were apparatus claims.

claims. Claim 1 of the '860 patent is representative, and reads in pertinent part:

> 1. A process for packaging a food item formed into a soft mass wherein the food is wrapped in individual slices comprising:
>
> *folding* a continuous web of heat-sealable thermoplastic material into *folded* condition including a *fold* ...;[2]
>
> . . . . .
>
> after the food item is inserted, flattening the web to form a *continuous slice* of the food item disposed between front sheet and the rear sheet of the web....[3]

'860 Patent, cl. 1 (emphasis added). Earlier, I construed the claim term "folding" to be synonymous with the "V-folding" language appearing in the specification of both patents. (Decision of 8/7/98 at 10.) According to the specification,

> the term V-folded condition refers to a length of material which has been folded over onto itself so as to form what may subsequently be identified as a front sheet and a rear sheet which are joined by the fold at the bottom, so as to approximate the letter "V" in cross section.

'860 Patent at col. 1 lines 28–33; '724 Patent at col. 1 lines 26–31. Additionally, I construed the claim term "continuous" to mean a length of flattened food product without any interruptions. (Decision of 8/7/98 at 8.)

The accused machines are known as the Kustner KE and KD individually-wrapped slice (IWS) machines. These machines' parent, the Kustner KA machine,[4] and another machine embodied in a 1959 prior art patent to Meissner, are central to defendants' charge of inequitable conduct against plaintiff.

---

**2.** Hereinafter, I refer to this step as the "folding step."

**3.** Hereinafter, I refer to this step as the "continuous slice limitation."

## II. JUDGMENT AS A MATTER OF LAW

### A. Applicable Law

#### 1. Judgment as a Matter of Law

Judgment as a matter of law may be granted against a party when "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). When a verdict is attacked based on legal insufficiency of the evidence, a court must decide "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." *Emmel v. Coca–Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir.1996). "The district court may not resolve any conflicts in the testimony nor weigh the evidence, except to the extent of determining whether substantial evidence could support a jury verdict...." *Lane v. Hardee's Food Sys., Inc.*, 184 F.3d 705, 707 (7th Cir.1999). Substantial evidence is "such relevant evidence as reasonable minds might accept as adequate to support the verdict." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 208 (9th Cir.1989).

"[A] motion [for judgment as a matter of law] shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed.R.Civ.P. 50(a)(2). "The articulation is necessary to achieve the purpose of the requirement that the motion be made before the case is submitted to the jury, so that the responding party may seek to correct any overlooked deficiencies in the proof." *Id.* advisory committee notes 1991 amendment subdivision (a). When deciding whether the movant has complied with the rule, a court should not scrutinize an

---

**4.** Plaintiff's infringement claims originally included the KA machine, but early in the trial, plaintiff removed this machine from the damages computation. (R. 171 at 60–61.)

oral motion in isolation. Instead, "the communicative content, 'specificity' and notice-giving function of an assertion should be judged in context." *Acosta v. Honda Motor Co.,* 717 F.2d 828, 831–32 (3d Cir. 1983); *see also id.* at 832 ("This colloquy, coupled with the rest of the exchange that preceded the denial of the motion, leads us to conclude that, taken in context, defendants' motion was sufficiently specific to satisfy Rule 50.").

"If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, ... [t]he movant may renew its request for judgment as a matter of law by filing a motion ...." Fed.R.Civ.P. 50(b). The Seventh Circuit has rejected "a rigid interpretation of the requirements of Rule 50(b)." *Bonner v. Coughlin,* 657 F.2d 931, 939 (7th Cir.1981). The application of Rule 50(b) should be considered in the context of both its particular purpose and the overarching purpose of securing a fair trial for all litigants. *Id.*

### 2. Infringement

■ In an infringement analysis, a court construes the disputed claims, and the trier of fact compares the disputed claims to the accused device. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir. 1998). Either literal infringement or infringement under the doctrine of equivalents must be proved.

■ "To prove literal infringement, the patentee must show that the accused device contains every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement." *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed.Cir.1998). "Judgment as a matter of law of no literal infringement is appropriate if no reasonable fact finder could determine that the accused devices meet every limitation of the properly construed claims." *Elkay Mfg. Co. v. EBCO Mfg. Co.,* 192 F.3d 973, 980 (Fed.Cir.1999).

■ To prove infringement under the doctrine of equivalents, the patentee must show that the accused device contains every limitation or its equivalent in the asserted claims. *Warner–Jenkinson, Inc. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The doctrine of equivalents must be applied on an element-by-element basis. *Id.* An accused element is an equivalent if the accused element and associated claimed element are not "substantially different." *Id.* at 39–40, 117 S.Ct. 1040. The tripartite function-way-result test has been approved by courts as a way for the trier of fact to determine equivalency: "[I]f the 'function, way, or result' of the assertedly substitute structure is substantially different from that described by the claim limitation, equivalence is not established." *Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1267 (Fed.Cir.1999).

The "all-elements rule" is a legal limitation on the doctrine of equivalents. The Supreme Court has promulgated the rule as follows: "[T]he application of the doctrine [of equivalents], even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety." *Warner–Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040. Grounded in the notice and definitional function of the claims, the all-elements rule prevents a patentee who claims far too narrowly from later ensnaring a competitor's product via the doctrine of equivalents. It is fundamentally unfair for a competitor who reasonably relies on the patentee's narrow claims to later become liable for patent infringement. "[A]s between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection ...." *Sage Products, Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1425 (Fed.Cir. 1997).

## B. Analysis

### 1. Literal Infringement

■ Defendants argue that there is no substantial evidence to support a jury ver-

dict of literal infringement as to both the folding step and continuous slice limitation. Plaintiff does not attack defendants' arguments *in toto,* but only as to the folding step of the claims. By this tack, plaintiff apparently concurs with defendants that the continuous slice limitation is not literally met by the accused machine, and thus plaintiff can rely only on the doctrine of equivalents for that element. Since infringement is an elemental inquiry, I of course consider whether the accused device literally meets the folding step. Accordingly, I inquire whether no reasonable jury could determine that defendants' accused method and apparatus, as embodied in the Kustner KE and KD machines, respectively contain each and every element of plaintiff's claimed method and apparatus.

It is evident from the record that plaintiff failed to present substantial evidence to support a finding of literal infringement.[5]

Per this court's claim interpretation, the folding step of plaintiff's claims requires that (1) the front and rear sheet of the V-fold be joined by a fold at the bottom, such that (2) the V-fold approximates the letter "V" in cross section. In its direct and cross-examination of witnesses, plaintiff attempted but failed to elicit the fact that the web used by the accused machines includes a fold at the bottom. (*See, e.g.,* R. 185 at 137 ("Q. Did you find that the operation of the Kustner machine in terms of folding to be exactly the same as this language if it requires a fold that approximates the letter V? Q. Well, it's not exact ...."); R. 177 at 131 ("What you have drawn at the bottom, I would call a V. I would not say that the one drawn around the oval tube approximates a V. I would say it approximates a U.").) In its brief countering defendants' JMOL motion,

plaintiff sidesteps this obvious lacuna in its case-in-chief. If accepted as substantial evidence of literal infringement, the evidence cited by plaintiff would effectively read out of the claim the requirement of the specification that the V-fold contain a fold.

Defendants quote a crucial portion of their cross-examination of plaintiff's lead inventor: "Q: All right. Kustner does not use your concept of V-fold, does it? A. No." (R. 185 at 47.) This statement is tantamount to a concession by plaintiff that defendants have not literally infringed the patents at issue. Plaintiff does not respond, but instead argues for a broader claim construction.

Plaintiff argues that the Kustner machine literally infringes plaintiff's claimed invention because Kustner "approximates" a V-fold. Underlying plaintiff's argument is its assumption that a V-fold without a fold at the bottom "approximates" a V-fold. Plaintiff quotes the jury instruction that defined folding as "creating a V-fold" and that defined V-fold as a "fold created when a length of material has been folded over onto itself ... to form ... a front sheet and a rear sheet which are joined by the fold at the bottom, so as to approximate the letter 'V' in cross section." (R. 167 at 10.) In a footnote, plaintiff suggests

> that a "v-fold" cannot be interpreted to be limited to a creased "v" shape, since that would read the term "approximate" right out of the definition of "v-fold" given in the patent specification and found by the Court in its *Markman* decision. Accordingly, Schreiber submits that the jury could quite properly have found that a fold in a "U" shape is a "v-fold" since such a fold approximates the letter "v" in cross-section.

5. The jury was not specifically asked to find whether plaintiff proved literal infringement. Instead, the special verdict question reads, "Do you find that plaintiff Schreiber Foods, Inc. proved by a preponderance of the evidence infringement of claims 1 or 2 of the '860 patent?" (R. 181 at 1.) I instructed

the jury on both literal infringement and infringement under the doctrine of equivalents. Since findings of literal infringement and infringement under the doctrine of equivalents are subsumed within the special verdict question, and the jury's finding as to each issue cannot be known, I address them in turn.

(R. 195 at 5 n. 3.) According to plaintiff, although Kustner does not contain a fold or crease between the front and rear sheets, its "U" shape "approximates" the letter "V" in cross section.

However, plaintiff's construction of "approximates" is flawed, for it misapplies the definition of "V-fold," ultimately reading the term "fold" out of the definition. Indeed, the definition requires that a front sheet and a rear sheet be joined by a fold at the bottom. And according to the definition, the *resulting* shape must approximate the letter "V" in cross section. Bearing in mind these requirements, it is evident that a "U" shape without a crease does not literally infringe the V-fold claimed by plaintiff. Although a "U" shape may approximate a "V" shape in cross-section, a "U" shape does not contain the required fold between a front and rear sheet.

Nor do other portions of the specification support plaintiff's broad interpretation of "approximates." The specification states that:

[t]he web is typically folded such that the rear sheet is longer than the front sheet to define a flap section in the rear sheet, which extends beyond the top edge of the front sheet. The flap section is typically folded over onto the front sheet to form a tubular web.

'860 Patent at col. 1 lines 33–37; '724 Patent at col. 1 lines 32–37. The implication of this passage is that a V-fold "approximates" the letter "V" because, unlike the letter "V," the sides of a "V-fold" are not of equal length. Because plaintiff's proffered interpretation—that "approximates" literally encompasses "U"-shaped folds—is not supported by the specification of the patents at issue, the "written description" requirement of 35 U.S.C. § 112 prevents plaintiff's claims from being so

interpreted. *See Vas–Cath v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed.Cir.1991).

Accordingly, I conclude that no reasonable jury could determine that the Kustner machine meets the folding step of the asserted claims. Therefore, the Kustner machine does not contain each and every limitation of the claimed invention, and defendants' JMOL motion as to literal infringement must be granted.

## 2. Infringement Under the Doctrine of Equivalents

Defendants next argue that judgment as a matter of law as to noninfringement under the doctrine of equivalents must be granted. Specifically, defendants assert that: (1) no reasonable jury could find that the differences between the claimed invention and the accused products and processes are insubstantial; and (2) the all-elements rule bars plaintiff's claim of equivalence.

In response, plaintiff argues that substantial evidence was presented to support the jury's finding of infringement under the doctrine of equivalents. In addition, plaintiff argues that defendants waived their right to bring a renewed JMOL motion on the all-elements rule since they never previously made one on this issue.

### a. Substantial Evidence

Defendants contend that no reasonable jury could find that the differences between the claimed invention and the accused products and processes are insubstantial. Defendants' contentions are directed to the continuous slice limitation and folding step of the asserted claims.[6]

To prove equivalency, plaintiff proceeded under the function-way-result test. Therefore, I inquire whether a reasonable jury could find that plaintiff proved by a

---

6. Plaintiff's presentation of the evidence at trial focused largely on the '860 patent. Thereafter, plaintiff incorporated "the same reasons that we discussed before," (R. 185 at 152), to support its contention that the assert-

ed claims of the '724 patent were infringed by the accused device. In similar fashion, I direct my discussion to the '860 patent, and apply my conclusions to the '724 patent where appropriate.

preponderance of the evidence that the patented and accused structures perform substantially the same function in substantially the same way to achieve substantially the same result. Plaintiff properly notes that "no specific formulation of evidence and argument is required." *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191 (Fed.Cir.1996).

### i. Continuous Slice Limitation

■ The continuous slice limitation requires "flattening the web to form a continuous slice of the food item disposed between front sheet and rear sheet of the web." '860 Patent, cl. 1. This court has defined

> "continuous" ... to mean a length of flattened food product without any interruptions. "Flatten[ ]" means [to make flat or flatter]. Any creasing or cross-sealing across the width of the web of film and product, which pushes out some of the food product from that cleated or cross-sealed zone even if a thin layer of food product remains (such as the result from the cleats or jaws indicated in the Bush patent) creates an interruption that results in separate or discontinuous slices or ribbons.

(Decision of 8/7/98 at 8, as amended in oral order of 8/17/98).

The "function" of the continuous slice limitation is a flattening operation that produces a continuous slice of cheese, thereby preparing the cheese for subsequent cross-sealing and the consequent creation of individual slices. '860 Patent, cl. 1. At trial, with respect to the '860 patent, plaintiff's expert, George Schroeder,[7] agreed that he found the "operation" of the '860 patent in the accused device. (R. 185 at 142.) Comparing the patented and accused devices, he stated that "I believe it's an insubstantial difference ... [b]ecause most of the material coming out of the flattening belts is in a flattened

position." (R. 185 at 143.) Further, flattening *and* "begin[ning] the formation of individual slices" occurs. (R. 185 at 144.) Because it relates to "flattening," a reasonable jury could have interpreted Schroeder's testimony as encapsulating the "function" prong of the function-way-result test. Therefore, a reasonable jury could have found that plaintiff proved the "function" prong of the test.

The "way" in which the patented invention achieves its result is described in the specification of both patents. Each specification states:

> The flattening station 22 includes a first or upper set of juxtaposed rollers 32, a lower set of juxtaposed rollers 34, and a pair of opposed belts 30. Each belt 30 is disposed around one set of rollers 32, 34. As the web with the cheese inserted therein passes between the two belts, the cheese is flattened to form a web comprising the tubular thermoplastic film and a continuous slice of cheese.

'860 Patent at col. 6 lines 33–42; '724 Patent at col. 6 lines 21–28. Thus, opposed belts are employed in the patented invention. In the accused machine, flattening belts with cleats perform the flattening function. (R. 185 at 142.)

With respect to the '860 patent, Schroeder did not specifically testify that the difference between the "way" employed by the claimed and accused devices was insubstantial. In fact, plaintiff's attorney did not inquire as to insubstantiality of differences in "way." Instead, plaintiff apparently relied solely on interchangeability to supply proof of the "way" prong. In the Bush prior art patent, U.S.Patent No. 3,542,570 (Bush), issued in 1970, the specification states that:

> If desirable, the advancing mechanism may also "preform" the tube into discrete packets 51 by pinching the tube

---

7. Throughout trial, and in their brief, defendants make much of their belief that Schroeder is not qualified to provide expert testimony on equivalency. That is a moot issue now, as I ultimately admitted his testimony at trial even after challenge by defendants. For purposes of defendants' JMOL motion, I assume that the jury accepted the veracity of Schroeder's testimony and drew all permissible inferences therefrom in favor of plaintiff.

together at longitudinally spaced intervals. This may be accomplished by adding a plurality of cleats 52 on each belt 48 arranged so that a pair of cleats, one on each belt, come into engagement with each other to pinch the tube 28 together (see FIG. 3).

Bush Patent at col. 3 lines 64–70. According to Schroeder:

A. It appears that either technique [the absence or use of cleats] could be used in the Bush patent to manufacture single slice cheese packages made on the Bush machine. In the first case without the cleats, they are using the flattening belts to in fact make a ribbon of material but also drive the mechanism, drive the material through the machine. The cleats are added at option in order to initiate the removal of cheese in the area where they make the cheese seal.

Q. Does this support your view, Mr. Schroeder, that the use of a ribbon of cheese that has some slight indentations is interchangeable with the technology where the ribbon of cheese has a continuous or uniform cross section?

A. Yes, it is.

(R. 185 at 145.) In other words, the Bush patent teaches that cleats may or may not be used in Bush-type packaging machines. By implication, Bush teaches that either discontinuous or continuous slices may be formed during the packaging process. In view of this evidence, a reasonable jury could have found insubstantial differences in the "way" prong of the function-way-result test.

The result of the continuous slice limitation is a flat, continuous slice without in-

dentations or interruptions. (*See* Decision of 8/7/98 at 8.) In the accused device, the result of the corresponding step is a flat ribbon of cheese with indentations. (R. 185 at 142.) As with the "way" prong, Schroeder did not provide particularized testimony as to the "result" prong. However, as noted *ante*, he testified that "I believe it's an insubstantial difference . . . [b]ecause most of the material coming out of the flattening belts is in a flattened position." (R. 185 at 143.) A reasonable jury could have found that an opinion as to the "result" prong was subsumed within Schroeder's opinion.[8] Furthermore, the above-noted evidence of interchangeability buttresses plaintiff's argument that the differences between the results obtained by the claimed and accused devices are insubstantial.[9]

### ii. Folding Step

■ The folding step in the '860 patent requires "folding a continuous web of heat-sealable thermoplastic material into folded condition including a fold." '860 Patent, cl. 1. As noted above, I have construed "folded condition" as "refer[ring] to a length of material which has been folded over onto itself so as to form what may subsequently be identified as a front sheet and a rear sheet which are joined by the fold at the bottom, so as to approximate the letter 'V' in cross section." '860 Patent at col. 1 lines 28–33; '724 Patent at col. 1 lines 26–31.

Plaintiff characterizes the function of the folding step as a forming operation. That characterization finds support in the asserted claims. Via the folding step, a con-

---

8. Opinions as to both the "function" and "result" prongs of the tripartite test may reasonably be divined in Schroeder's single statement. The reason is that in the context of the continuous slice limitation, the reference to result ("flattened position") necessarily implies a reference to function (flattening). Of course, in other contexts, function and result may not be describable with like terms, and a reasonable jury could not find "insubstantiality" as to multiple prongs of the tripartite test on the mere basis of a conclusory statement attesting to "insubstantiality."

9. It is true that "[t]he known interchangeability of the accused and claimed elements is potent evidence that one of ordinary skill in the art would have considered the change insubstantial." *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1519 (Fed.Cir.1995), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Therefore, plaintiff's appeal to known interchangeability supports its infringement theory.

tinuous web is folded such as to leave an open longitudinal side. After the folding step, the open longitudinal side of the web is sealed "to define a continuous tubular web." '860 Patent, cl. 1. Plaintiff presented evidence that its patented invention and the accused product have substantially the same function. Specifically, Schroeder testified that: "[T]he intent in both cases is trying to *form a tube* that subsequently can be longitudinally sealed and affect [sic] a hermetic package and at the same time provide an opening feature. Both processes do functionally the same thing." (R. 185 at 137–38 (emphasis added).) Although plaintiff's "folded condition" contains a crease, and the accused products and processes do not, a reasonable jury, in view of Schroeder's testimony, could find that, with respect to function, the differences are insubstantial.

Relative to the "way" employed in the folding step, the '860 patent states that "the tubular web of thermoplastic material is formed by providing a continuous film or web of thermoplastic material and folding the web into V-folded condition, *in a manner* known in the art." '860 Patent at col. 4 lines 51–54 (emphasis added). Schroeder testified that the web is "brought around a forming collar" to achieve folding of the web. (R. 185 at 119–20).

The evidence adduced at trial was sufficient to support the jury's finding of equivalence as to "way." First, as between the lap seal of the accused machine and the fin seal of the claimed invention, Schroeder testified that:

Q. [I]s there any reason you know of people of ordinary skill in the art in the 1980s wouldn't appreciate that these two technologies are interchangeable?

A. That's correct. Most packaging machinery companies have the option of going either way.

(R. 185 at 140.) David Shaft, a co-inventor, also testified that "the lap seal and fin seal are interchangeable." (R. 185 at 101.) Defendants' expert, Joseph Hotchkiss, testified that a forming collar was employed during the forming operation in the accused machine. (R. 177 at 23.) Although Hotchkiss opined that these two ways are substantially different, (R. 177 at 26), the jury was entitled to reject his opinion in lieu of Schroeder's and Shaft's testimony.[10]

Claim 1 of the '860 patent indicates that the result of the folding step is a plastic material in "folded condition including a fold, a folded longitudinal first side and an open longitudinal second side, the web on one side of the fold defining a front sheet and the web on the other side of the fold defining a rear sheet." '860 Patent, cl. 1. When this result is successfully achieved, longitudinal sealing of the web and insertion of cheese into the tube may subsequently occur. *Id.*

Upon hearing the evidence at trial, a reasonable jury could have found that the difference between the "result" obtained in the patented machine and that obtained in the accused machine is insubstantial. However, the evidence is barely enough to support such a finding. In support of his conclusory statement that "the end product is substantially the same," (R. 185 at 137), Schroeder stated that "the intent in both cases is trying to form a tube that subsequently can be longitudinally sealed and affect [sic] a hermetic package and at the same time provide an opening feature." (*Id.* at 137–38.) Although it is faithful to the broad claim language of the asserted patents, the second statement lacks much specificity. In particular, Schroeder did

---

**10.** In their JMOL brief, defendants submit that:

> Obviously, if different process steps lead to results which are "fundamentally different" (fin versus lap seals), one of which is a "substantial improvement" over the other, the differences between those process steps cannot be deemed "insubstantial," as the

standard for determining equivalence requires.

(R. 188 at 28.) I decline to endorse this proposition. In certain technological contexts, an insubstantial variation between process steps may in fact produce a substantial variation in outcomes.

not expressly compare the specific result of the patented invention—a fold with a crease—with that of the accused product and process—a fold without a crease. Nevertheless, in view of Schroeder's and Shaft's testimony that fin seal and lap seal technologies are interchangeable, a reasonable jury could have found insubstantial differences with respect to the result of the folding step.

### iii. Conclusion

Therefore, I conclude that a reasonable jury could have found that, with respect to the function, way, and result of both the continuous slice limitation and the folding step, the differences between the claimed and accused devices are insubstantial. However, I underscore that in at least one respect, the evidence is barely enough to support the finding. In any event, I now explore whether defendants' all-elements rule arguments are waived, and, if not, whether the all-elements rule precludes a finding of infringement under the doctrine of equivalents.

### b. All–Elements Rule

### i. Waiver Argument

Defendants orally moved for judgment as a matter of law at the close of plaintiff's case-in-chief. Defendants described two of their motions as (1) "[j]udgment as a matter of law there's no infringement of any of the claims of the '860 patent under the doctrine of equivalents;" and (2) "judgment as a matter of law that there's no infringement of the '724 patent under the doctrine of equivalents." (R. 171 at 84–85.) When defendants made these initial motions, and when they renewed these motions after the close of plaintiff's case-in-chief, (R. 177 at 218), defendants did not specifically note the all-elements rule as a basis for judgment in their favor. Following the verdict, in their JMOL brief, defendants for the first time expressly argued that plaintiff's theory of equivalence effectively eliminates both the folding step and continuous slice limitation, (R. 188 at 22–26), and thus that

plaintiff's equivalence claim is barred by the all-elements rule. Plaintiff contends that defendants waived their all-elements rule argument by not previously raising it before or during trial.

As stated earlier, the specificity or notice-giving function of a JMOL motion must be judged in context. *Acosta,* 717 F.2d at 831–32. The Supreme Court has made clear the connection between equivalency—a factual question for the trier of fact—and two "legal limitations" on the doctrine of equivalents, namely, prosecution history estoppel and the all-elements rule. In *Warner–Jenkinson,* the Court set forth specific instructions for district court judges:

> Where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment.... *Of course, the various legal limitations on the application of the doctrine of equivalents are to be determined by the court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict.* Thus, under the particular facts of a case, if prosecution history estoppel would apply or if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further material issue for the jury to resolve.

*Warner–Jenkinson,* 520 U.S. at 38 n. 8, 117 S.Ct. 1040 (citations omitted) (emphasis added). The Court's instructions are clear. When a party makes "a motion for judgment as a matter of law [as to noninfringement under the doctrine of equivalents] at the close of the evidence and after the jury verdict," *id.,* the judge must determine whether the all-elements rule precludes a finding of infringement under the doctrine of equivalents.[11]

---

11. The other legal limitation on the doctrine of equivalents, prosecution history estoppel, was briefed extensively by both parties. I

decided that no estoppel arose from the prosecution history of the asserted patents. (*See* Decision and Order of 10/26/99.)

■ Here, defendants moved for judgment as a matter of law as to noninfringement under the doctrine of equivalents. This motion was sufficient to raise the applicability of the all-elements rule. Requiring that a defendant make two discrete Rule 50 motions—one based on substantiality of the evidence, and another based on the all-elements rule—and holding that failure to make the latter motion constitutes a waiver would not only lead to unjust results in patent litigation but would prevent a court from performing its function as required by *Warner–Jenkinson.* In particular, in cases in which substantial evidence supported a finding of equivalency as to the function, way, and result prongs of the tripartite test, but where a plaintiff's theory of equivalence vitiated a claim element, the plaintiff could "prove" infringement *absent legal infringement* if the defendant did not sufficiently specify that its JMOL motion as to noninfringement was directed to the all-elements rule. In effect, waiver would prevent a court from exercising its role as the sole arbiter of legal limitations on the doctrine of equivalents.

Additionally, the Seventh Circuit counsels me to reject "a rigid interpretation of the requirements of Rule 50(b)." *Bonner,* 657 F.2d at 939. As the advisory committee notes on Rule 50 indicate, the requirement of specific articulated grounds for a JMOL motion is so that the responding party may correct overlooked deficiencies in proof. *See* Fed.R.Civ.P. 50 advisory committee notes 1991 amendment subdivision (a). Here, defendants' JMOL motion with respect to noninfringement under the doctrine of equivalents put plaintiff on notice of the equivalence issue and the legal

limitation on the doctrine's application. Plaintiff was not prejudiced in any way in connection with its ability to present proof or argument to the jury.

Rule 50 is designed to flush out arguments so that errors may be prevented without the need for appellate intervention. *Urso v. United States,* 72 F.3d 59, 61 (7th Cir.1995). Arguments relating to the doctrine of equivalents and to the legal limitations on its application were sufficiently "presented to the district court, so the function of Rule 50 has been served." *Id.* Finally, waiver is one means by which a legal forfeiture may occur. *See Freytag v. Commissioner of Internal Revenue,* 501 U.S. 868, 894 n. 2, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) (Scalia, J., concurring). Forfeitures are never favored; equity always leans against them. *See Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.,* 988 F.2d 1157, 1163 (Fed.Cir. 1993) (discussing laches). Neither a waiver nor a forfeiture occurred here.

Accordingly, defendants did not waive noninfringement arguments grounded in the all-elements rule and it is my role to determine whether, based on either substantiality of the evidence or the all-elements rule, defendants' motion must be granted.

### iii. Application of the All–Elements Rule

■ Defendants argue that plaintiff's theory of equivalence "effectively eliminates" both the continuous slice limitation and folding step of the '860 and '724 patent claims. Plaintiff disagrees.

As noted above, the all-elements rule is a question for the court.[12] *Warner–Jenkinson,* 520 U.S. at 38 n. 8, 117 S.Ct. 1040. As

12. The jury instruction relating to equivalency read as follows:

You may find that defendants' product or method infringes a claim of plaintiff's patent, even if not every element or step of that claim is present in defendants' machines or method. *However, to do so, you must find that there is an equivalent component, part or method step in defendants' machines or method for each element or step of the patent*

*claim that is not literally present in the defendants' machines or method.*

(R. 167 at 12 (emphasis added).) Citing this instruction, plaintiff asserts that "the jury decided the 'all-elements' rule." (R. 195 at 16–17.) I disagree. This instruction merely told the jury that the doctrine of equivalents must be applied by the jury on an element-by-element basis. It did not permit the jury to decide the legal question of the all-elements rule.

promulgated by the Supreme Court and developed by the Federal Circuit, the rule proscribes equivalence theories that vitiate claim elements. *Id.; see also Overhead Door Corp. v. Chamberlain Group, Inc.,* 194 F.3d 1261, 1271 (Fed.Cir.1999). "[F]or a patentee who has claimed an invention narrowly, there may not be infringement under the doctrine of equivalents in many cases, even though the patentee might have been able to claim more broadly. If it were otherwise, then claims would be reduced to functional abstracts, devoid of meaningful structural limitations on which the public could rely." *Sage Prods.,* 126 F.3d at 1424.

In *Sage Products,* the claims at issue were directed to a disposal container. The independent claim at issue recited, *inter alia,* the two elements of "an elongated slot at the top of the container body" and "a first constriction extending over said slot." *Id.* at 1422. The accused device contained a slot *within* the container body, and plaintiff argued that "having two constrictions below the top of the container [in the accused device] is the same, for purposes of infringement, as having one constriction above and one constriction below [as claimed]." *Id.* at 1422–23.

Declaring that "the doctrine of equivalents does not grant [the plaintiff] license to remove entirely the 'top of the container' and 'over said slot' limitations from the claim," the Federal Circuit held that the defendant did not infringe the asserted patent. *Id.* at 1424, 1426. It reasoned that:

> The claim at issue defines a relatively simple structural device. A skilled patent drafter would foresee the limiting potential of the "over said slot" limitation.

No subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later-developed technology, obfuscated the significance of this limitation at the time of its incorporation into the claim. If Sage desired broad patent protection for any container that performed a function similar to its claimed container, it could have sought claims with fewer structural encumbrances.

*Id.* at 1425 (citations and footnotes omitted). In a subsequent decision, the Federal Circuit explained that:

> the proposed application of the doctrine in *Sage Products* would have utterly written out of the claim not one, but at least two (maybe more) express limitations of the claim. Indeed under Sage Products' equivalents theory, a finding of equivalents for one limitation ("at the top") would necessarily require writing out of the claim another limitation ("over said slot"). No matter how the patentee purported to apply the claim to the accused device under the doctrine, the device was always missing at least one limitation. Thus, the claim language specifically negated the patentee's equivalence theory.

*Overhead Door,* 194 F.3d at 1271.

At trial, plaintiff presented and relied on evidence of known interchangeability. Specifically, it was known in the prior art that (1) belts with cleats are interchangeable with those without cleats; and that (2) lap seals are interchangeable with fin seals. Plaintiff offered this evidence in order to show that (1) a continuous slice, as claimed, is equivalent to a discontinuous slice, as embodied in the Kustner machines;[13] and that (2) the claimed method

---

**13.** Earlier, I construed the term continuous to mean "a length of flattened food product without any interruptions." (Decision of 8/7/98 at 8). If a ribbon of cheese contains *any* interruptions, the ribbon is discontinuous. (*Id.*) I specifically stated that

> [a]ny creasing or cross-sealing across the width of the web of film and product, which pushes out some of the food product from that cleated or cross-sealed zone even if a thin layer of food product remains (such as

the result from the cleats or jaws indicated in the Bush patent) creates an interruption that results in separate or discontinuous slices or ribbons.

(*Id.*) Under my definition and as conceded by plaintiff through its lack of argument on the literal infringement question regarding this element, the Kustner machine creates discontinuous slices by pushing out the food product from the cross-sealing zones.

of folding, which involves V-folding, is equivalent to the method of forming a lap seal embodied in the Kustner machines.

But unlike the Bush patent, plaintiff's patents do not mention interchangeable cleated or uncleated belts, and instead— distinguishing themselves from Bush—add the words "continuous slice." I must assume that "continuous slice" has some meaning, or else the drafters would not have used it. The drafters could have used broader language—using something like "a length of flattened food item or items" instead—and incorporated language into the specification indicating that cleats might or might not be used. They did not. Instead, plaintiff drafted claims of limited scope, claiming now that the doctrine of equivalents encompasses what plaintiff was arguably entitled to claim—but *did not claim*. Therefore, like *Sage Products*, "[n]o subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later-developed technology, obfuscated the significance of this [continuous slice] limitation at the time of its incorporation into the claim." *Sage Prods.*, 126 F.3d at 1425.

Similarly, the patent drafters prepared apparatus and method claims that employ a specific type of folding—V-folding. Indeed, original claim 1 of the '860 patent application contained the terms "V-folded condition" and "V-fold." Though the "V-" in these terms was deleted during prosecution, such deletions cannot circumvent the "written description" requirement of 35 U.S.C. § 112, which requires that an applicant be "in possession" of the claimed invention as of the filing date. (Decision and Order of 10/26/99.) In view of intrinsic evidence, I concluded, when construing the claim term "folding," that the specification of the '860 patent supports only V-folding. (Decision of 8/7/98 at 10–12.) Now, having heard plaintiff's own evidence that lap seals were in the prior art at the time the parent application was filed, I conclude that plaintiff could have disclosed in the specification that folding might also be effectuated by specific prior art methods of forming lap seals. Plaintiff did not. The deficiency of its claims is further highlighted by plaintiff's unsuccessful attempts to amend the specification with language which appears to imply that V-folding was simply a preferred embodiment of "folding." Again, like *Sage Products*, "[n]o subtlety of language or complexity of the technology, nor any subsequent change in the state of the art, such as later-developed technology, obfuscated the significance of this [folding] limitation at the time of its incorporation into the claim." *Sage Prods.*, 126 F.3d at 1425.

Like the theory of equivalence advanced in *Sage Products*, plaintiff's theory of equivalence effectively eliminates two clear limitations in the claims: (1) the requirement in the claims and specification that the slice be "continuous;" and (2) the requirement that only "V-folding" falls within the metes and bounds of the claimed invention.[14] Defendants were entitled to rely on the clear structural limitations of the '860 and '724 patents, and should not be held accountable for placing reliance thereon.

14. In my earlier decision and order relating to prosecution estoppel, I stated that:

> At most, a reasonable competitor studying the new matter rejection in the prosecution history would conclude that the claimed invention only reads on embodiments that include V-folding. A reasonable competitor would not conclude that plaintiff surrendered equivalents of "V-folding."

(Decision of 10/26/99 at 11.) In that context, at issue was one legal limitation on the doctrine of equivalents, prosecution history estoppel. Here, at issue is the other legal limitation, the all-elements rule. To say that plaintiff did not clearly and unmistakably surrender equivalents of V-folding during prosecution before the Patent Office is merely to say that plaintiff, when arguing infringement at trial, is free to argue that other types of folding are equivalent to V-folding. It is *not* to say that the all-elements rule never limits what types of folding legally constitute equivalents. In other words, prosecution history estoppel estops a patentee from making certain equivalency arguments, and the all-elements rule addresses equivalency arguments on their merits.

Accordingly, because the claim language of the '860 and '724 patents "specifically negate[s]" plaintiff's equivalence theory, *see Overhead Door,* 194 F.3d at 1271, I hold that the all-elements rule bars a finding of infringement under the doctrine of equivalents.

## III. INEQUITABLE CONDUCT

Notwithstanding my conclusion that the all-elements rule bars a finding of infringement under the doctrine of equivalents, I now set forth my findings of fact and conclusions of law on the inequitable conduct bench trial issue.

### A. Applicable Law

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [Patent] Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section." 37 C.F.R. § 1.56. "Applicants for patents, including their patent attorneys, are required to prosecute patent applications in the PTO with candor, good faith, and honesty." *Elk Corp. v. GAF Bldg. Materials Corp.,* 168 F.3d 28, 30 (Fed.Cir.1999). Failure to do so may give rise to a charge of inequitable conduct. *Id.* A determination of inequitable conduct represents the ultimate sanction against a patentee—unenforceability of his patent. *Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1383 (Fed. Cir.1998).

■■■ To prove inequitable conduct, the party asserting the defense must prove by clear and convincing evidence that (1) material information known to an applicant in the applicant group was withheld from the Patent Office; and (2) the failure to disclose resulted from an intent to deceive the Patent Office. *Elk Corp.,* 168 F.3d at 30. As a preliminary matter, a threshold level of both materiality and intent must be established. *Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327 (Fed. Cir.1998). If established, the court must then weigh materiality and intent. "The

more material the omission, the less evidence of intent will be required in order to find that inequitable conduct has occurred." *Id.* Finally, the court must adjudge whether the applicant's conduct is so culpable as to warrant a determination that the patent is unenforceable. *Id.* Absent a showing of the requisite materiality and intent, the defense fails as a matter of law.

■■■ Although material information most often falls neatly within the rubric of "prior art," it need not always do so. Materiality includes " '*any* information that a reasonable examiner would substantially likely consider important in deciding whether to allow an application to issue as a patent.' " *Akron Polymer,* 148 F.3d at 1382 (quoting *Akron Polymer Container Corp. v. Exxel Container, Inc.,* Nos. 95–1023–1035, 1995 WL 620148, at *5 (Fed. Cir. Oct. 20, 1995)). Assuming that the Patent Office is not aware of it,

> information is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1)[i]t establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or (2)[i]t refutes, or is inconsistent with, a position the applicant takes in … [a]sserting an argument of patentability.

37 C.F.R. § 1.56.

■■■ Intent need not be proven by direct evidence, but may be inferred from clear and convincing evidence of the surrounding circumstances. *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992). "Close cases should be resolved by disclosure, not unilaterally by the applicant." *Id.*

### B. Applicant Group

The duty of disclosure extends to:

(1) Each inventor named in the application;

(2) Each attorney or agent who prepares or prosecutes the application; and

(3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

37 C.F.R § 1.56(c).

As applied to plaintiff, the duty of disclosure extends to an applicant group comprising inventors Vincent Meli, Michael Matharani, Ted Brzezinski, Shaft, and James Urmanski; patent attorneys Gus Siller and Michael Mazza; [15] and director of engineering Mark Peterson, (see R. 191 Ex. 19). No conclusive evidence was proffered at trial that plaintiff's executives were substantively involved in the preparation or prosecution of the applications that respectively issued as the '860 and '724 patents.

## C. Kustner KA Machine

Defendants argue that plaintiff, with the intent to deceive, withheld from the Patent Office material information concerning the Kustner KA machine.

### 1. Materiality

According to defendants, the information was material because it is substantially likely that a reasonable examiner would have considered the information important. Specifically, defendants contend that the information establishes a prima facie case of unpatentability of the asserted claims under: (1) 35 U.S.C. § 102(b); (2) § 102(a); and (3) § 102(f). (R. 189 at 18.)

I now assess whether defendants established that the specific information possessed by plaintiff [16] meets a threshold level of materiality.

#### a. § 102(b)

Title 35 U.S.C. § 102(b) provides that "[a] person shall be entitled to a patent unless ... the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." Thus, the statutory section accords prior art status to an invention that is "on sale" more than one year before the applicant's filing date.

Defendants argue that the information held by plaintiff regarding the KA machine was material from a § 102(b) standpoint, that is, the information could have given rise to the "on-sale" bar. In response, plaintiff first argues that since the jury found in its special verdict that defendants had not proven that the Kustner KA machine was "on sale," then the information held by plaintiff is not prior art and is not material, and this court is bound by the jury finding. Second, plaintiff argues that even if the trial evidence is considered on its merits, defendants failed to prove by clear and convincing evidence that the KA machine is prior art.

Before assessing the evidence on its merits, I reject plaintiff's assertion that this court is bound by the jury's finding that the KA machine is not prior art. [17] In

---

**15.** Attorney Siller prosecuted the '860 patent application, and Attorney Mazza prosecuted the '724 patent application. The record indicates that other attorneys were involved in the prosecution, but neither party asserted that their involvement is relevant.

**16.** Throughout this discussion, I occasionally use "plaintiff" and "members of plaintiff's applicant group" synonymously to simplify the discussion. However, I underscore that pursuant to 37 C.F.R § 1.56(c), my inquiry focuses on members of plaintiff's applicant group, for it is this group that must discharge its duty before the Patent Office. Even if defendants establish that plaintiff's high-level executives had material information and in-

tentionally concealed it, such evidence is irrelevant to the inequitable conduct charge if the executives (1) were not substantively involved in the preparation or prosecution of the application, and (2) did not disseminate the information to members of the applicant group. Any attempt by an alleged infringer to conflate an opponent's corporate actors with the opponent's applicant group represents a distortion of the patent law, and also signals to a court that clear and convincing evidence of materiality and intent may be lacking.

**17.** Plaintiff declared: "The jury found that the KA machine is not prior art. Information cannot be 'material,' in an inequitable con-

its special verdict form, the jury was asked: "Do you find that defendants proved by clear and convincing evidence that claims 14, 15, 18, 21, 22, 24, or 25 of the '724 patent are invalid, as anticipated because the Kustner Model KA machine was on sale in the United States prior to June 5, 1988?" (R. 181 at 3.) In contrast, the question for this court under inequitable conduct essentially is: "Do you, judge, conclude that it is substantially likely that a reasonable examiner would have considered the information held by plaintiff concerning the Kustner Model KA machine to be important in deciding whether to allow the '724 patent application to issue?" These questions are very different. In the first question, the jury was asked to find whether the evidence proved that the Kustner Model KA machine was in fact "on sale" in the United States, thus giving rise to the § 102(b) statutory bar that renders claims invalid. In the second question, this court asked whether it is substantially likely that a reasonable examiner, had she known what information plaintiff held about the Kustner KA machine, would have considered the information important during prosecution.

As noted above, information is "important" (i.e. material) when it supports a prima facie case of unpatentability of claims, or is inconsistent with an applicant's arguments. See 37 C.F.R. § 1.56. Information does not lose the status of "important" merely because the patentee in litigation implies that it would have been successful in rebutting an examiner's prima facie case had it disclosed the information. On the contrary, the law imposes the duty of candor on the applicant notwithstanding an applicant's confidence that it will successfully rebut the prima facie case.

In their brief, defendants distill the true nature of plaintiff's proffered argument: an attempt to elevate the standard for inequitable conduct from "material information" to "information a jury found to be invalidating." (R. 199 at 8.) Indeed, such an elevated standard would encourage inequitable conduct. After all, "[w]ithholding the information and securing the patent would entitle [inventors] to the presumption of validity, and would require clear and convincing evidence of invalidity to overcome that presumption." (Id.) Accordingly, plaintiff's argument cannot stand.

I now assess the evidence adduced at trial on its merits to determine whether a threshold level of materiality has been established. The "critical date" for purposes of the "on sale" bar—i.e., one year before the parent application was filed—is June 5, 1988.

■ "An on sale bar determination requires that [1] the claimed invention asserted to be on sale was operable, [2] the complete invention claimed was embodied in or obvious in view of the device offered for sale [in the United States], and [3] the sale or offer was primarily for profit rather than for experimental purposes." Key-Stone Retaining Wall Sys., Inc. v. Westrock, Inc., 997 F.2d 1444, 1451 (Fed.Cir. 1993). Accordingly, I inquire whether the information in the applicant group's possession during prosecution of the patents would have established a prima facie case of each of the three "on sale" requirements, and therefore, a prima facie case of unpatentability of a claim.[18]

As to operability, the relevant evidence at trial was provided by inventor Meli, who

duct sense, unless it is prior art. It is that simple." (R. 196 at 1.)

18. In arguing that the KA machine was inoperable before the critical date, plaintiff references testimony of both third parties and employees of plaintiff that were not in the applicant group. For instance, one processed cheese manufacturer testified that the machine "[i]nitially ... would not work with

polypropylene." (R. 196 at 12.) At the same time, plaintiff attacks defendants' arguments as comprising testimony of those not in the applicant group. Unfortunately for plaintiff, I must disregard post hoc attestations as to inoperability. The issue here is whether those in the applicant group believed that the KA machine was inoperable, not whether the KA machine was in fact inoperable.

testified that in late 1987, prior to the critical date, he received from Gerald Miller, head of plaintiff's subsidiary, IWS slices produced by the Kustner machine. (R. 175 at 77.) The packages were longitudinally heat sealed, (id.), in a "polypropylene of some sort," (id. at 92). Meli testified that he understood the machine to be inoperable "with polypropylene, sealing it at the higher speeds." (Id. at 89.) However, he knew that "the Kustner machine design was a hot fill, then the web was crimped, and then cooled." (Id. at 83.)

For purposes of the inequitable conduct determination, the testimony of inventors Shaft and Brzezinski fell short of showing material knowledge. It is only evident from the testimony that the inventors heard "rumors," (R. 175 at 100), and a "passing comment," (R. 176 at 70), about Kustner's activities. Nevertheless, I conclude that Meli's testimony presents a prima facie case of the operability prong of the "on sale" bar. Although Meli believed that the KA machine was inoperable at high speeds, he knew that the machine was operable at lower speeds, producing heat-sealed packages similar to those produced by the claimed invention. Therefore, at least from a prima facie standpoint, inoperability at high speeds does not diminish the materiality of the Kustner machine.

■ These observations notwithstanding, it is the "device offered for sale [in the United States]" component of the "on sale" bar determination that disposes of defendants' assertions as to materiality under § 102(b). In particular, Meli indicated that prior to the beginning of the instant litigation, he had no knowledge that Kustner was attempting to market machines in the United States. (Id. at 91.) Moreover, there was no direct evidence at trial that anyone else in plaintiff's applicant group, including the attorneys prosecuting the

patent applications, had knowledge of such sales.

Therefore, I conclude that a prima facie case as to the "device offered for sale" component is not met by the evidence.[19] It follows that defendants failed to show that members of the applicant group had knowledge probative of a prima facie case of unpatentability, and that from a § 102(b) standpoint defendants failed to make a threshold showing of materiality.

#### b. § 102(a)

Title 35 U.S.C. § 102(a) states that a person shall be entitled to a patent unless "the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent."

Defendants argue that plaintiff withheld material information by failing to apprise the Patent Office of the date of a Kustner brochure depicting the KA machine—because the brochure was undated, the Patent Office could not consider it as a § 102(a) "printed publication."[20] In response, plaintiff first cites what it labels "ample" trial evidence showing conception and reduction to practice regarding its patented machine by July 1987, which antedates the November 1988 date of the Kustner brochure. Second, plaintiff argues that "the jury's findings ... include a finding that Schreiber's invention was made prior to September 1987. The jury's verdict therefore moots the ... Brochure Section 102(a) argument raised by the defendants." (R. 196 at 10 n. 3.)

Plaintiff's arguments are without merit. Regarding the latter argument, as I discussed above, this court's inquiry is entirely different from the question posed by the jury questions. The issue is not whether plaintiff could have rebutted the examin-

---

**19.** Because that component is not shown, I need not reach the remaining components set forth in *KeyStone*.

**20.** Plaintiff asserts that the record contains no evidence that the KA machine was "known or

used by others" in the United States before plaintiff's date of invention. In view of their briefs, defendants do not appear to view this issue as a point of contention.

er's prima facie case of anticipation or obviousness if given the opportunity. The essential issue is whether members of plaintiff's applicant group held knowledge that a reasonable examiner would substantially likely have considered important in deciding whether to allow the '860 and '724 patents to issue. Under the patent laws, an applicant may not assume the role of examiner. The applicant must submit material information to the examiner, and then attack or rebut the examiner's prima facie case.

As to the former argument concerning conception and reduction to practice, plaintiff's constructive reduction to practice date was the filing date of the parent application of the '860 and '724 patent applications. That filing date was June 5, 1989. Because the date of the Kustner brochure, November 1988, predates June 5, 1989, an examiner potentially could have made out a prima facie case of unpatentability.[21] Before or after the prima facie case was made, plaintiff could have filed a Rule 131 affidavit to "swear behind" the Kustner brochure.[22]

 These remarks notwithstanding, I conclude that the evidence adduced at trial does not establish that members of the applicant group actually knew of the date of the brochure. With respect to employees of plaintiff falling within the applicant group, the record is devoid of evidence. With respect to the attorneys prosecuting the '860 patent, the evidence brought forth at trial was that in a letter, they instructed director of engineering Peterson to:

> please determine the publication date, the page numbers of the Kustner brochure. Furthermore, it should be confirmed that the document is a brochure

published by Kustner industries. Once this information is supplied to the Examiner, I believe he will consider its disclosure in his next Office Action.

(R. 191, Ex. 19.) The attorneys apparently did not know the publication date, and their "office was simply told no one knows the date of that brochure," (R. 189 at 26). Because not even a colorable showing that members of the applicant group had *knowledge* of the brochure was made here, a threshold showing of materiality certainly was not made. Accordingly, inequitable conduct cannot stem from plaintiff's failure to furnish the publication date of the Kustner brochure to the Patent Office.

### c. § 102(f)

Title 35 U.S.C. § 102(f) provides that "[a] person shall be entitled to a patent unless ... he did not himself invent the subject matter sought to be patented."

> This is a derivation provision, which provides that one may not obtain a patent on that which is obtained from someone else whose possession of the subject matter is inherently 'prior.' It does not pertain only to public knowledge, but also applies to private communications between the inventor and another which may never become public.

*OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1401–02 (Fed.Cir.1997).

Defendants argue that plaintiff withheld material "detailed evidence about the manner in which Kustner's machine worked." (R. 189 at 18 n. 10.) According to defendants, the evidence "likely would have drawn a § 102(f) rejection on the grounds that Schreiber's 'invention' was derived

---

21. This statement assumes that the substance of the prior art disclosed by the brochure would have established a prima facie case of unpatentability based on anticipation or non-obviousness.

22. Title 37 C.F.R. § 1.131 states in pertinent part:

> When any claim of an application ... is rejected under 35 U.S.C. 102(a) ... or 35

U.S.C. 103 based on ... reference to a ... printed publication, the inventor of the subject matter of the rejected claim ... may submit an appropriate oath or declaration to overcome the ... publication. The oath or declaration must include facts showing a completion of the invention in this country ... before ... the date of the printed publication.

from the work of others." (*Id.*) Plaintiff counters that:

> the defendants' § 102(f) argument should be rejected for two separate reasons: (1) even if addressed on the merits, it must be rejected since the brochure is dated too late to be relevant to any derivation issue ... and (2) the § 102(f) argument should not be considered here, since the defendants failed to place Schreiber on notice of it during discovery, it was not raised at trial, and it would be unfair to consider it now. (R. 196 at 10.)

Plaintiff misconstrues defendants' argument. While defendants focus on disclosure of the manner in which Kustner's machine worked, plaintiff seeks to redirect this court's focus to the sales brochure discussed above. I will address defendants' argument as formulated. Additionally, I disagree with plaintiff's assertion that it would be unfair to consider the § 102(f) argument.[23] It would be unfair to the Patent Office and the public if plaintiff withheld material information with intent to deceive, but this court formalistically refused to consider probative evidence.

I thus address defendants' argument on its merits, inquiring whether the applicant group withheld information that a reasonable examiner would have substantially likely considered important. At trial, inventor Meli repeatedly demonstrated that he held knowledge about the Kustner KA machine. For instance, he adopted his previous deposition testimony:

> "A. I believe ... [Kustner] had replaced the crimping belts with some chains that carried, they were doing the same thing without utilizing the rubber

belts. There were chains on sprockets going down carrying cross bars. That's how they pre-crimped. Then the drums. After that, [Stappard, plaintiff's sales agent,] did tell us that they were heating them, and I am not sure whether it was one pair of drums or two pairs of drums.... Then after that in coming out of the cooling tank, they went into some real weird configuration to get to a stacker."

(R. 175 at 80). Further, as stated above, in 1987 Miller gave Meli IWS packages that had been produced by the Kustner machine, (*id.* at 77), and Meli believed the packages were wrapped in a "polypropylene of some sort," (*id.* at 92). Miller also showed Meli photographs of the KA machine. (*Id.* at 86.) At trial Meli agreed that in "late 1987, [he] knew that the Kustner machine design was a hot fill, then the web was crimped, and then cooled." (*Id.* at 83.)

Meli testified as to an April 1988 meeting he had with Robert Bush (inventor of the Bush patent), Miller, and others "to give us permission to develop a machine ... to sell in competition with [Kustner]." (*Id.* at 83–84.) The following interchange took place on direct examination:

> Q. Was there a discussion at that meeting about how the Kustner machine worked?
>
> A. I don't remember that.
>
> Q. [Defendants' attorney references Meli's deposition.] You were asked the following question:
>
> > "Q. Was there discussion about how the Kustner machine worked?

---

23. In support of its plea for fairness, plaintiff cites to, *inter alia,* a case in which the "court refus[ed] to consider new inequitable conduct contention raised for first time in post-trial briefing." (R. 196 at 11.) In that case, however, the defendant "in its post-trial brief advanced a *different and entirely new* contention ... based on a document ... introduced into evidence for the limited purpose of buttressing [expert] testimony." *E.I. Du Pont De Nemours & Co. v. Phillips Petrol. Co.,* 656 F.Supp. 1343, 1378 (D.Del.1987) (emphasis added), *rev'd and vacated in part on other grounds,* 849 F.2d 1430 (Fed.Cir.1988). Here, by contrast, defendants merely assert that an additional § 102 novelty bar flows from the facts emerging at trial. Like the other § 102 arguments advanced at trial, the § 102(f) derivation argument centers around what the applicant group knew about the Kustner KA machine but failed to disclose to the Patent Office. It therefore does not constitute "a different and entirely new contention."

"A. No. I don't think so. *We were
all aware of how it worked.*"

True answer?

A. Yes.

Q. In April of 1988?

A. Yes.

(*Id.* at 85 (emphasis added).) Meli's testi-
mony shows that he and those present at
the meeting, including Miller, did indeed
know how the Kustner machine worked.

The issue remains whether the evidence
shows that attendees' awareness encom-
passed material information. That issue is
illuminated by a November 16, 1987 letter
from plaintiff's sales agent to Miller.[24]
The letter describes how the Kustner ma-
chine worked:

The level control appeared to operate
in an entirely different manner to ours
[i.e., the Bush machine] and IQMM [a
Spanish company] indicated it was per-
fect. The Cheese Pump appeared to be
much smaller in size and drive, the reg-
istration was simple and accurate and
totally different in principle to [plain-
tiff's].

. . . .

The system of cooling appeared to be
identical to ours.

. . . .

IQMM did indicate that the crimping
section was much heavier and more posi-
tive than ours although operating on a
similar principle. The slices were also
manufactured in a vertical plane exactly
the same as ours with a much simpler
tube formation followed by this extreme-
ly heavy crimping section, a rotary
crimping head, similar to ours, then *fol-
lowed by a second crimping head which
was heated possibly up to 150 degrees
celsius.*

*There was very little cheese in the
crimp after discharge from the crimping
belts and this was virtually removed by
the first set of crimping heads, the sec-
ond set of crimping heads had only to*

seal polypropylene to polypropylene
ending with a clear crimp.

(R. 191 Ex. 9 (emphasis added).)

From a § 102(f) standpoint, the final
portion of the passage facially seems very
significant. The reason is that, in the
abstract, a principle of operation embodied
in the Kustner machine is the combination
of hermetic sealing and removing the food
item from the cross-sealing zones. Yet, in
a May 18, 1994 interview between the Pat-
ent Office examiner, inventor Meli, and
Attorney Siller, "[a]pplicant stated that the
combination of hermetic sealing and re-
moving the [food item] is not shown by the
prior art. It is the Examiner's position
that such a claim would read over the prior
art of record." (R. 191 at 379.) In a
subsequent amendment, plaintiff's attor-
ney argued that:

During the May 16, 1994 interview,
the Examiner agreed that 'the combina-
tion of hermetic sealing and removing
the [food item from the cross-sealing
zones]' is not shown by the prior art.
(Examiner Interview Summary Record,
Paper No. 18, May 18, 1994). The Sep-
tember 7, 1994 Office Action ... indi-
cates ... that Claims ... would over-
come the § 103 obviousness rejection 'if
amended to clearly and positively set
forth the means/step for forming her-
metic seals, ... and forming a hermeti-
cally sealed package.'

(R. 191 at 411.) Assuming that plaintiff
derived its invention from knowledge its
agents had gleaned about the Kustner ma-
chine, then plaintiff, by declaring the nov-
elty of its own invention over the prior art,
made material misrepresentations before
the Patent Office in the above prosecutory
contexts.

■ On this record, however, I con-
clude that defendants have failed to show
that the knowledge possessed by Meli es-
tablishes a prima facie case of derivation.
From a technological perspective, the de-

---

**24.** Though the letter was addressed to Miller,
Meli's above-quoted testimony that they
"were all aware of how it worked," in concert

with his other testimony, is probative of the
fact that Meli was not kept in the dark as to
the letter's contents.

scription of the Kustner machine provided by plaintiff's agent is very sketchy, providing few details as to the mechanics of the machine. In particular, there is no evidence that Meli knew *how* the machine hermetically sealed and removed the cheese from the cross-sealing zones. In other words, defendants have not shown that Meli's knowledge, alone or in combination with prior art, would enable a person of ordinary skill in the art to practice plaintiff's claimed invention. *See Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1578 (Fed.Cir.1997) (the standard for derivation is "whether the communication enabled one of ordinary skill in the art to make the patented invention").

Accordingly, I conclude that the information plaintiff withheld from the Patent Office relating to how the Kustner machine worked does not meet the threshold of materiality required under an inequitable conduct inquiry.

### 2. Intent

In light of my conclusions concerning the materiality of the knowledge held by members of the applicant group in view of §§ 102(a), (b), and (f), I need not reach the intent issue.[25] Therefore, defendants failed to prove inequitable conduct by plaintiff in connection with the Kustner machine.

### D. Meissner Patent

Defendants argue that plaintiff, by failing to disclose U.S.Patent Number 2,916,864 ("Meissner") during prosecution of the '724 patent,[26] withheld material information from the Patent Office with the intent to deceive. I first explore whether threshold levels of materiality and intent were proffered at trial.

### 1. Materiality

The parties dispute whether the Meissner patent is material. Meissner discloses a "continuous and high speed apparatus for packaging fluid, semi-fluid and powdered or granular materials in flexible-walled containers." Meissner at col. 1 lines 15–17. One of the declared objects of the Meissner invention is to form and fill a long casing with said fluid or the like, and to then seal the casing "at spaced intervals, with the sealing being accompanied with a spreading of the contained material at the sealing areas." *Id.* at col. 1 lines 48–54.

Defendants argue that Meissner was highly material to the patentability of the claims of the '724 patent, while plaintiff argues that Meissner is cumulative of or less material than the other references the Examiner had before her during prosecution. For instance, plaintiff in its response brief asserts that U.S.Patent No. 4,586,317 to Bussell, which was cited by the Examiner, teaches "the critical claim limitation of removing all the cheese before forming the hermetic cross seal." (R. 193 at 3.) However, plaintiff merely points to several passages in the Bussell specification. During trial, plaintiff did not apprise defendants of its reliance on this reference, thus preventing defendants from calling an expert to testify as to the materiality of the patent. Accordingly, I decline plaintiff's invitation to act as a person of ordinary skill in the

---

**25.** Defendants assert that "Schreiber Clearly Engaged in Acts Intended to Deceive Kustner." (R. 189 at 22.) As a normative matter, conduct of this sort may be deemed anticompetitive or unfair, but it does not necessarily legally suffice to prove inequitable conduct. The inequitable conduct inquiry is precisely tailored, focusing on the materiality of the information held by the applicant group and whether members of the applicant group intended to deceive the Patent Office by withholding the information.

**26.** Defendants notified plaintiff of the existence of the Meissner patent in October 1997. Because the '860 patent had issued two years earlier, on August 15, 1995, the present inequitable conduct inquiry is only germane to the '724 patent, whose issue fee had been paid as of October 1997; the '724 patent did not issue until December 30, 1997. *See* 37 C.F.R. § 1.313(b)(1)–(2) (allowing applicant to petition for withdrawal of the application from issue on account of a violation of 37 C.F.R. § 1.56 or unpatentability of claims).

art (which I am not) and construe the Bussell patent in ex parte fashion.

Turning to the parties' remaining contentions as to the materiality of Meissner, I again note that a key argument for the patentability of plaintiff's claims was that "the combination of hermetic sealing and removing the [food item from the cross-sealing zones] is not shown by the prior art. It is the Examiner's position that such a claim would read over the prior art of record." (R. 191 at 379.) According to defendants, Meissner is material because, unlike the Bush patent, it discloses the very feature plaintiff touted as overcoming the prior art—hermetic sealing at the cross zones.[27] Plaintiff responds that the evidence adduced at trial fails to show that Meissner discloses this feature.

In view of this controversy, I first reiterate my earlier construction of the claim term "hermetic seal." Specifically, I concluded that " '[h]ermetic seal' thus means a seal that will exclude air and will be leakproof at normal temperatures and atmospheric pressures to the extent the thermoplastic materials disclosed in the specification allow." (Decision of 8/7/98 at 15.) My construction approximated that advanced by plaintiff at the *Markman* hearing; I rejected defendants' attempts to define hermetic seal to require an absolute air and vapor barrier.

In arguing against the materiality of Meissner, however, plaintiff seems to have reversed its position on claim construction, now implying that "hermetic seal" has a narrower meaning that excludes the seals disclosed in Meissner. Despite my observation that "the films disclosed in the Schreiber patents are semi-permeable and thus permit passage of minute amounts of gas over time," (*id.*), that is, plaintiff's patented seal is not truly hermetic, plaintiff asserts that the seal of Meissner is simply a heat seal, not a hermetic seal, and

notes that the Meissner patent does not contain the word "hermetic," (R. 187 at 13). In other words, plaintiff suggests that without a hermetic seal, as narrowly defined by plaintiff, Meissner is not material to the patentability of plaintiff's claims.

Plaintiff further distinguishes its apparatus from Meissner on the basis of force exerted, operating speed, and amount of cheese removed by plaintiff's cross-sealing apparatus. In particular, plaintiff identifies several statements made by Hotchkiss during cross-examination. Hotchkiss agreed that "we don't know whether or not the Meissner machine exerts a greater force than the Bush machine in removing cheese." (*Id.* at 116.) And he agreed that "it's possible that the cheese isn't completely removed before the heating begins." (*Id.* at 117.) Finally, plaintiff focuses on the speeds at which plaintiff's and Meissner's apparatus functioned. According to plaintiff, the difference in speeds arguably shown at trial evidences a critical difference between plaintiff's and Meissner's apparatus, undermining defendants' anticipation argument.

In essence, plaintiff asks me not only to narrow my claim construction of the term "hermetic seal," but also to import into the claims the distinguishing characteristics plaintiff has identified. I find no support for plaintiff's arguments in the '724 patent's intrinsic record or the extrinsic record that emerged at trial. The reason is that, as to these distinguishing characteristics, the Examiner indicated during prosecution that the combination of hermetic sealing and removing the food from the cross-sealing zones overcame the prior art. At no time did the Examiner state that a particular speed or force capability was inherent in the independent claims at issue. Nor did plaintiff argue for a claim construction reliant upon speed and force. Yet plaintiff now attempts to persuade this

---

**27.** Plaintiff initially contended that Meissner does not disclose another feature, namely, the formation of individual slices, but defendants point to passages in the Meissner specification that belie this contention. (*See* R. 198 at

5.) In any event, because Bush discloses formation of individual slices, Meissner's disclosure is at best merely cumulative of Bush—and thus not material—with respect to this limitation in the '724 patent claims.

court that speed and force were points of novelty of plaintiff's claimed invention, and that Meissner, by not operating at a certain speed or force, is thus not material.[28] Further, plaintiff finds it significant that, notwithstanding the '724 patent claims' limitation that "substantially all" of the food item must be removed, Hotchkiss was not certain whether "all" of the food item was removed by Meissner. I am not persuaded by plaintiff's arguments. The key issue is whether Meissner is material to what was claimed by plaintiff in the '724 patent and not shown by the prior art before the Examiner, namely, hermetic sealing and removing substantially all the food item from the cross-sealing zones.

As to Meissner's materiality to claim 14,[29] defendants contend that Meissner discloses "a longitudinal hermetic seal," "applying sufficient pressure at the cross-sealing zones to eliminate substantially all of the cheese from the cross-sealing zones," and "hermetically seal[ing] the cross-sealing zones." They identify portions of the Meissner specification supportive of this assertion. First, with respect to the "longitudinal hermetic seal" of claim 14, Meissner states that the disclosed apparatus "heat seals" web material "with its longitudinal edges in overlapping relationship." Meissner at col. 3 lines 2–10. Second, with respect to claim 14's limitation of "applying sufficient pressure at the cross-sealing zones to eliminate substantially all of the cheese from the cross-sealing zones," Meissner discloses upper sealing jaws that "forcefully engage with the casing and thus effectively squeeze all of the fluid or semi-fluid material away from between the opposed sealing jaws." Id. at col. 4 lines 67–70. Third, as to claim 14's limitation of

"hermetically seal[ing] the cross-sealing zones," Meissner declares that "[t]ransverse sealing of the stuffed casing is actually effected when the opposing jaws 29 and 31 are brought together and the Nichrome element 53 is energized." Id. at col. 4 lines 57–59. For certain materials, "it is desirable that the casing film be provided with tiny openings ... so that substantially all of the air within the casing can escape." Id. at col. 7 lines 47–50.

Against the backdrop of my construction of "hermetic seal," which recognizes that plaintiff's hermetic seal is not truly hermetic, this element-by-element comparison between (1) elements of claim 14 not shown by the Bush patent and (2) the disclosures of Meissner leads me to conclude that a threshold showing of the materiality of Meissner was made by defendants. Meissner fills in the gaps of the Bush patent, and the references together establish a prima facie case of obviousness against plaintiff's claimed invention.

My conclusion that Meissner is material is buttressed by Hotchkiss's testimony at trial. Hotchkiss stated that "Meissner indicates that you can put cheese through this machine, so my assumption is that the force is sufficient to remove the cheese. I take Meissner at his word." (R. 177 at 117.) Additionally, he testified that all the limitations of the '724 patent claims are disclosed by Meissner. (See id. at 98–104.) However, his personal "caveat," (id. at 97), was that within the instant technology, "I don't quite agree with the word hermetic.... The word hermetic is not used in a strict sense here," (id. at 59). "Hermetic seals are basically ... impervious to the transfer of gases or vapors or liquids at

---

28. Dependent claim 15 prescribes that the "rate [be] sufficient to produce in excess of 700 hermetically sealed individual [sic] cheese packages per minute." Dependent claim 25 is similar. An elementary canon of claim construction, the principle of claim differentiation, provides that each claim has its own scope. Applying that canon, claims 14 and 18 have a respectively broader scope than the claims that depend therefrom. This means that claims 14 and 18 are not limited

to any range of speeds. Accordingly, assuming that Meissner discloses a slower machine that nonetheless discloses the combination of hermetic sealing and removing the food item from the cross-sealing zones, Meissner is material.

29. The dispute also goes to claim 18, but its limitations are not materially different from those of claim 14.

normal temperatures and conditions. These are not that way." (*Id.*) It is clear that Hotchkiss's view of the meaning of "hermetic seal" is in accord with mine. Unlike plaintiff, I do not find that this view diminishes the weight of Hotchkiss's testimony.

## 2. Intent

Defendants assert that plaintiff intentionally failed to disclose Meissner to the Patent Office before issuance of the '724 patent. Defendants' assertions are directed solely to Attorney Mazza, whom defendants informed of the existence of Meissner in October 1997. In their briefs, defendants state that "[w]e do not propose to argue [the intent] issue," (R. 190 at 8), and that "[i]t is for this Court to decide whether the failure of Schreiber's counsel to inform the Patent Office of Meissner ... was inadvertent or a tactical judgment," (R. 198 at 7).

Defendants "ask only that the Court consider [nine] facts in making its determination of intent." (R. 190 at 8.) However, not all of defendants' statements are facts. For instance, defendants represent that "[t]he failure of the Bush reference to disclose production of a continuous slice without indentations was a central argument for patentability of the patents in suit." (R. 190 at 9). Plaintiff properly notes that this representation is unsupported by any evidence adduced at trial. Further, defendants represent that "[t]here can be no question that Meissner's cross sealer would have produced 'hermetic' transverse seals to the extent Schreiber's cross sealer does," (*id.*), but this was a disputed issue at trial. Finally, defendants mistakenly attribute testimony of Mazza to Attorney Siller. Accordingly, I accord these particular statements little or no weight.

■ Consideration of defendants' remaining statements and the record as a whole leads me to conclude that defendants have fallen far short of making a threshold showing of intent. In arguing that intent has been shown, defendants point to Mazza's knowledge of Meissner, the asserted materiality of Meissner, and the fact that Meissner was not cited. In effect, defendants advance a theory of inferential culpability, "argu[ing] that intent to deceive or mislead should be inferred from the fact that certain information was not provided to the examiner," *Therma–Tru Corp. v. Peachtree Doors Inc.*, 44 F.3d 988, 996 (Fed.Cir.1995). The Federal Circuit has frowned upon such a theory, *id.*, and because the record here lacks additional probative evidence, I decline to embrace defendants' theory.

At trial, when asked why he had not cited Meissner, Mazza answered that, "To be honest, I didn't think about it. If I had thought about it, with the benefit of hindsight, I am sure I would have cited it." (R. 187 at 51.) Elaborating upon his answer, Mazza maintained that Meissner "was not in fact material to the patentability of the either '860 or '724 claims," (*id.*), but that from a litigation perspective, "it would have been much easier to have cited the Meissner patent.... But unfortunately, I didn't think of that," (*id.* at 54.)

I find Mazza to be credible and accept his explanation that his failure to disclose Meissner stemmed from inadvertence, not from an intent to deceive. *See, e.g., Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1073 (Fed.Cir.1994) ("The trial judge found the witness credible and the explanation plausible."). Defendants have presented no evidence that sufficiently undermines Mazza's testimony.

Because defendants have not made a threshold showing of intent, the inequitable conduct inquiry ends here. Thus, defendants failed to prove inequitable conduct by plaintiff in connection with the Meissner patent.

## IV. CONCLUSION

Accordingly,

IT IS ORDERED that defendants' motion for a ruling of noninfringement as a matter of law (doc. # 188) is **GRANTED.**

IT IS ORDERED that in regard to the inequitable conduct court trial issue, my findings of fact and conclusions of law are as set forth above in section III, and, in conclusion, that defendants have failed to prove inequitable conduct by plaintiff's applicant group before the Patent Office.

**THEREFORE, IT IS ORDERED** that defendants' motion for a ruling of inequitable conduct in connection with the Kustner machine (doc. # 189) is **DENIED,** and defendants' motion for a ruling of inequitable conduct in connection with the Meissner patent (doc. # 190) is **DENIED.**

IT IS ORDERED that this case is **DISMISSED** based on the granting to defendants of judgment as a matter of law.

**FINALLY, IT IS ORDERED** that the Clerk accordingly enter judgment for defendants in both cases.